Ida G. Hogg, Individually and as Administrator of the Estate of Lloyd W. Hogg, Deceased, Appellant, v. Robert Eckhardt, Appellee.

Gen. No. 32,233.

Opinion filed June 19, 1928.

ALBERT FINK, FRANCIS M. LOWES and HENRY M. SHABSIN, for appellant.

COOKE, SULLIVAN & RICKS, GEORGE H. MASON and BEN N. BREDING, for appellee; GEORGE A. COOKE and EDWARD H. FIEDLER, of counsel.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This is a suit in chancery in which each of the parties has appealed from the decree. The appeals have been consolidated for hearing and will be considered together, 32,233 being complainant's appeal and 31,999, defendant's appeal.

Complainant is the widow of Lloyd W. Hogg, deceased, and since the death of her son, who was a co-complainant, has prosecuted the suit individually and as administratrix of his estate.

The bill seeks recovery of alleged assets of said estate. Those particularly sought consist of shares of stock in various corporations alleged to have been obtained from decedent by defendant Robert Eckhardt, without payment of any consideration, at a time when a confidential and trust relation existed between them and when Hogg was mentally incompetent. The answer took issue upon these several allegations, and asserted defendant's ownership of the stock but without disclosing how or when he became owner thereof, or the theory of the defense ultimately relied upon, that of a resulting trust, based upon the claim that the stock was purchased by Hogg with Eckhardt's money, but issued in Hogg's name.

The stock thus involved consists of 1,320 shares of Union Carbide & Carbon Corporation, 593 shares of American Steel Foundries, 100 shares of Stewart-Warner Speedometer Corporation, 63 shares of Middle West Steel Utilities, and 2,438 shares of Sinclair Consolidated Oil Corporation, represented by various certificates issued from time to time between November, 1917, and December, 1920, inclusive, all issued in the name of Hogg and indorsed in blank by him at or about the time of their issuance, and transferred into the name of defendant Eckhardt in April, 1921, at a time when, as found by both the master and chancellor, Hogg was incompetent to understand and transact ordinary business, and when, as found by the chancellor, Eckhardt sustained a confidential and fiduciary relation towards Hogg.

Indulging the presumption under well-settled principles of law that the transfers of said certificates of shares from the name of Hogg to Eckhardt under such circumstances were presumptively fraudulent and void (Roby v. Colehour, 135 Ill. 300, 341; Beach v. Wilton, 244 Ill. 413, 424), and that the burden of proof was thus cast upon Eckhardt to show by clear and convincing evidence that the transfers were honest

and fair and upon an adequate consideration, the chancellor held that Eckhardt had met the burden as to the Union Carbide stock but had failed to do so with respect to the other shares of stock involved, and accordingly awarded the Union Carbide stock to defendant and the other shares of stock to complainant, dividing the costs between them.

While the master did not find there was an absence of a fiduciary relation between Hogg and Eckhardt he based his conclusions mainly on findings that there was no such domination or control over Hogg by Eckhardt that he became trustee for Hogg, and that Eckhardt's possession of the stock so indorsed and transferred was presumptive evidence of ownership, and complainant had failed to prove the transfer while Hogg was of unsound mind and that it was without adequate consideration. Exceptions to these findings were sustained. Under the master's theory the burden of proof was cast on complainant, while under the chancellor's it rested on defendant.

We shall not undertake an analysis of the pleadings, or discuss the somewhat strained construction defendant places upon their intendment. Suffice it to say we cannot concur with the often repeated statements in his brief that the bill as amended purports to be based on an actual "assignment" of the certificates in question, or that such is the fact. While it is stipulated that the certificates were indorsed in blank at or about the time they were issued, it is plain that indorsement alone, without delivery, would not confer title. So, while Eckhardt was found in possession of them so indorsed, his legal title thereto rests upon the proof adduced under these issues:

1. Was there a relationship of confidence and trust existing between Hogg and Eckhardt?

2. If so, did said certificates of stock come into Eckhardt's possession during its existence?

3. If these two questions be answered in the affirmative has defendant, upon whom the burden of proof would then rest, shown by clear and convincing evidence his ownership of said shares, or any of them?

4. Regardless of the existence of such a relation, was there any consideration paid by Eckhardt for said shares, or any of them?

The decree answers the first question in the affirmative and the others partly so. Before considering them certain uncontroverted facts should be stated.

Lloyd W. Hogg died at the age of 52 years, August 4, 1921, from an automobile accident, resulting probably from lost vision resulting from a brain tumor. In 1901 he entered the employ of the American Spiral Pipe Works, a manufacturing corporation, with which he was connected until his death, being its vice president, treasurer, and general sales manager from 1915. He never returned to his office after January 31, 1921, except for a short time in the following June to attend a meeting of the company's stockholders. Prior to that time he had manifested eccentricities and symptoms of aphasia. The next day, February 1, 1921, he was stricken with severe pains in his head, to relieve which two sinus operations were had, one in February and one on March 14, when specialists diagnosed his trouble as a brain abcess or tumor on the left side of the brain. Accordingly a brain operation was had on March 31, by opening the skull about an inch and a half by two inches, and the brain bulged through the opening, a condition which continued to the time of his death. A post-mortem examination disclosed a glioma tumor in the left occipital lobe of the brain about three inches in diameter, with a calcified cyst over an inch in diameter, and a condition of degeneration. According to medical opinion the tumor had been growing from one to two years before his death and would cause defective vision and both word aphasia and object aphasia, with

which he was afflicted more or less for many months, if not to some extent for a year prior to his death.

A close friendship between Hogg and Eckhardt had existed for many years. They exchanged invitations to dine twice a week, and Hogg called Eckhardt on the telephone regularly at six o'clock every other evening of the week. Not only were they thus habitually together and in communication, but the relationship was so close and apparently confidential that Eckhardt on September 23, 1920, rented a safety deposit box in their joint names at the First National Bank, Chicago, where Hogg had a private box and a deposit account, and later, on April 19, 1921, rented another safety deposit box in their joint names at the Sheridan Trust & Savings Bank where Eckhardt kept his deposit account. He was Hogg's almost constant attendant during the latter's confinement at the hospital from such operations, and his daily companion up to his death. Strained relations had existed between Mr. and Mrs. Hogg, and they had broken up housekeeping in the previous August, he going to live at the Chicago Athletic Club, and she and their son (since deceased) at a hotel. About the middle of January, 1921, she and her sister went to California, where they remained until called back after the brain operation. Attention to many of the detailed arrangements for their departure and their return devolved upon or was assumed by Eckhardt. During Hogg's confinement in the hospital Eckhardt alone (besides the doctors and nurses) was permitted to see Hogg. Eckhardt seems to have assumed authority in that matter. During that time he occupied an adjoining room, was almost in constant attendance upon Hogg and attended to all matters connected with his illness, and with Mrs. Hogg's and the son's necessities in the meantime, paying all expenses, for which he later had an accounting with Hogg. Hogg left the hospital April 14 and went to live with Eckhardt at the Gras-

mere hotel, owned and conducted by the latter. Later in that month Eckhardt made out the returns for Hogg's Federal income tax for the year 1920.

What Mrs. Hogg learned of Hogg's condition while absent in California, and even after her return, was mainly from Eckhardt. She saw her husband only once in that interval before his death. That was after he went to live with Eckhardt at the Grasmere hotel. While denied by Eckhardt there was much testimony to the effect that he kept both her and her relatives from seeing Hogg after the brain operation.

On February 1, 1921, Hogg owned 888 shares of common, and 700 shares of preferred stock of the American Spiral Pipe Works, with which he had been connected for many years and of which he was an officer. The dividends from these shares, together with his salary, amounted for the six years, 1915 to 1920, inclusive to $577,050. In January he sold the preferred stock for $73,500. A check for that amount was deposited by him February 25, 1921, in the Corn Exchange National Bank, where he then had a deposit. Eckhardt wrote the deposit slip. After Hogg's death there was found in his private safety deposit box only said 888 shares of common stock, United States Liberty bonds for $1,100, war savings stamps for $1,155, and some promissory notes, shares of stock and other papers of doubtful value, and some watches and jewelry.

No memoranda of his possession of any other property or of the disposition of it was found—nothing to indicate what had become of his vast accumulations in the immediate preceding years. On April 20, six days after he left the hospital, he withdrew from said bank $40,000 in currency (consisting of three $10,000 bills and ten $1,000 bills). The day before Eckhardt had rented the safety deposit box at the Sheridan Trust & Savings Bank in the joint name of himself and "Wendell" Hogg, a name which it does not ap-

pear was used by Hogg in either his business or social relations. On July 5, Hogg cashed another check in his said bank for $10,000 in currency, the last he ever cashed. On April 20 and July 5, the days of such withdrawals, and after the hours they were made, Eckhardt visited that box. For what purpose it is not disclosed. He next visited it two hours and thirteen minutes after Hogg's death. For what purpose is left for inference or conjecture. It was never visited by Hogg. The other box rented in their joint names was also visited by Eckhardt prior to Hogg's death, July 5, 1921. Both of these boxes were found empty after Hogg's death. The latter box and Hogg's private box were opened by the representative of the State inheritance tax department on August 5, in the presence of Eckhardt and Mrs. Hogg. For some reason Eckhardt did not see fit to disclose to them the fact of the rental of the other box carried, as aforesaid, in his name and that of "Wendell Hogg," and it was not examined until August 23, 1921.

While the withdrawal of such a large amount of currency, coincident with Eckhardt's rental of a joint safety deposit box and his visit thereto, and its disappearance thereafter must remain unexplained in the absence of any memoranda left by the deceased, and because the law closes the mouth of defendant, the circumstances are not without significance in their bearing on the claim of a confidential and trust relationship. Together with the other facts of the case, all of which we deem it unnecessary to detail, they tend strongly to confirm the existence of such a relation between Hogg and Eckhardt at least from September 23, 1920, when Eckhardt rented the first safety deposit box in their joint names. Surely the procurement of a joint safety deposit box to which both had access would of itself seem quite sufficient to indicate a relation of reposed trust and confidence, which forms the very basis of a fiduciary relation, and

from which it will be presumed *(Leonard v. Burke,* 226 Ill. 422), and "it is the confidence which one party reposes in the other, or is supposed to repose in him, which prompts the courts to require frankness, candor and sincerity," etc. *(Casey v. Casey,* 14 Ill. 112, 114.) Our Supreme Court has said:

"The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused, —in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another."

Using such language in *Thomas v. Whitney,* 186 Ill. 225, and again in *Mayrand v. Mayrand,* 194 Ill. 45, the court added, "The only question is, does such a relation exist?" That, under the circumstances shown in this case, such a relation existed and that the proof was ample to support the finding of the decree of its existence at the time Eckhardt was found exercising ownership of stock in Hogg's name and procuring the transfer into his own, we cannot doubt.

It follows therefrom that the burden was cast upon Eckhardt to show by clear, convincing and unequivocal proof that he acted with perfect good faith and did not abuse or betray the confidence reposed in him. (Id.) When such a relation exists any transactions between the parties will be closely scrutinized by a court of equity "with jealous vigilance." *(Dowie v. Driscoll,* 203 Ill. 480, 490.) The presumption is against their validity. *(Roby v. Colehour, supra; Mayrand v. Mayrand, supra; Mors v. Peterson,* 261 Ill. 532.) The rule is so universal we need not dilate further upon it. The question is, does the proof of-

fered by Eckhardt rebut the presumption of fraud, or establish his claim to a trust arising from his alleged payment for the stock by evidence "clear, unequivocal and convincing," and "sufficient to establish beyond a doubt the fact of payment by the alleged beneficiary." *(Akin v. Akin,* 276 Ill. 447, 449), especially when reliance is placed mainly on parol testimony to establish such a trust. *(Dodge v. Thomas,* 266 Ill. 76, 86.)

It is urged as ground for accepting the master's rather than the chancellor's conclusions that there is an absence of proof of any domination or control by Eckhardt over Hogg. While we cannot concur in the contention as to the necessity of such proof and think the various circumstances of the relation, especially after the operations were resorted to, imply, if they do not affirmatively indicate, such control, yet we do not deem domination or control essential to establish a fiduciary relation. While under some circumstances it will be implied from the relation, where undue influence is claimed, it more frequently characterizes the abuse of the relation rather than the relation itself. As before stated the term "fiduciary relation" is a broad one, and courts of equity refrain from hedging it within set limitations. (2 Pomeroy's Eq. Juris. [3d Ed.] par. 956.)

Holding, therefore, as we do, that such a relation existed between Eckhardt and Hogg at the time the former was found in possession of certificates issued to the latter and not expressly assigned to him, and that under such circumstances the burden of proof is cast upon Eckhardt to establish by clear and convincing evidence his ownership, or his defense of a resulting trust *(Lurie v. Sabath,* 208 Ill. 401; *Roby v. Colehour, supra; Thomas v. Whitney, supra; Mayrand v. Mayrand, supra; Dowie v. Driscoll, supra; Mors v. Peterson, supra),* the main question presented is

whether the proof adduced by Eckhardt is of such character.

We shall first consider the evidence produced by Eckhardt as to his possession of such certificates prior to April, 1921, and prior to the time such relation was found to exist. It consists of the testimony of three witnesses, Draper, Warren and Taylor.

It was to Draper that Eckhardt delivered the certificates April 4, 1921, for transfer into his name, having called him to the hospital the day before to make arrangements therefor. As before stated at that time Hogg was considered to be in a critical condition and lay strapped to his bed. For many years Draper was a salesman of stocks and bonds. In that capacity he dealt with Eckhardt and sold him stock. On one occasion, in February, 1920, when visiting Eckhardt at the Grasmere hotel he met Hogg and claims he saw the latter sign some half dozen certificates of Sinclair Oil and Union Carbide stock on their reverse side and turn them over to Eckhardt to witness; that he asked Hogg if he had been buying stocks, and the latter replied he had been buying some for Eckhardt. It is only the latter statement which has any special significance, inasmuch as all the stock in question was so indorsed and witnessed. If the inference is sought to be drawn from that statement that that particular stock was bought for Eckhardt it is somewhat strange that Eckhardt was called upon to witness an assignment to himself, even if there was an excuse for not specifically naming him as the transferee thereof. It is usually only disinterested persons who are called upon to witness signatures or acts that may later be called in question. But this witness is relied upon to establish Eckhardt's possession of all the stock in question in July, 1920, when, as he claimed, he accompanied Eckhardt to a safety deposit vault in the Sheridan Trust & Savings Bank for the purpose of determining the transfer charges on such stock, which

he said Eckhardt asked him to transfer. He then noted, as he claimed in his first answers, all the stock in question, attempting to enumerate "about" the number of certificates of each and other details, by which he could identify them. In the course of such examination he significantly reiterated seeing in particular the certificate for 100 shares of Stewart-Warner, which, however, was not issued until several months later. When his attention was directed to the fact that this and some of the other certificates had not then been issued, he explained that he was "just speaking in general about the certificates," and then pretended to be able to identify them from the "signatures on their back." That one dealing, as he was, both before and after July, 1920, in numerous and various stocks and bonds of different companies, dates and denominations, should be able to recall so many details with such accuracy as he undertook to state, especially as he had no personal interest therein and merely made a casual inspection to estimate the transfer charges, which he then only attempted to give approximately at between $125 and $160,—an estimate he may well have made without the necessity of going to the vault,—would seem to indicate either a marvelous memory or a too ready willingness to assist a friend to establish a crucial fact in the case. It is not difficult, however, to account for his ability to remember so many details, if, as probable and usual with careful lawyers, he was shown the certificates before taking the witness stand to see if he could identify them. ·Such an important fact would hardly be left for development on the witness stand or to an untested memory from a casual inspection made three years before. It may well be asked why should Eckhardt have called him to estimate the transfer charges nine months before he delivered the certificates to him for transfer, and why should Eckhardt have taken that particular time to have it made?

The witness Warren, a hotel manager and friend of Eckhardt for many years, testified that the latter also took him to a deposit box in the same place November 6, 1920, for the purpose of getting a canceled note he had paid Eckhardt November 6 (produced to verify the incident), and that he then saw two packages of stock certificates, one of Carbide and the other Sinclair stock, and that he "leafed them over" and noted that they were issued to and indorsed by Hogg. While he does not appear to have noticed any of the other stocks so specifically identified by Draper, we may well wonder why Eckhardt found it necessary to take him to his private vault merely to deliver a paid note, and what motive actuated the witness' unusual conduct of "leafing over" and taking note of another man's private papers in which he had no interest. We cannot but marvel that the right to personal possession and ownership of such a large amount of valuable stocks standing in the name of another and coming into the hands of defendant during an interval of three preceding years, as is his claim, should be left by a business man like him to hang upon such a slender thread. It taxes credulity.

Taylor, president of Hogg's company, merely testified that on one occasion, apparently the latter part of 1920, knowing that Hogg as a subscriber to Carbide stock was entitled to the privilege of purchasing additional stock at $40 a share, he asked him if he was "going in any deeper in Carbide stock," and Hogg replied that "he had bought some for a friend of his." But that Hogg exercised such privilege for Eckhardt is not the only inference from such a statement and it certainly has no probative value to show his ownership of all, if any, of the stock in question. There is, however, a singular coincidence in the facts that about that time, on November 8, 1920, two certificates for Carbide stock were issued to Hogg, one for 100 shares,

and another for 20 shares, and that Ray, a witness for complainant, testified that Eckhardt told him about the last of June, 1921, that he had only 20 shares of Carbide stock. We shall refer to Ray's testimony later. That Hogg's friendship for Eckhardt was such that he may have purchased stock for his benefit is not improbable. But its identity and amount cannot be left to mere surmise.

The only other evidence relied upon to support Eckhardt's claim of ownership of the stock in question is that consisting of certain canceled checks drawn by him to his own order and indorsed, and testified to as having been cashed by Hogg (though without his indorsement), part of them at the Union Trust Company and part of them at the Corn Exchange National Bank. All of said checks (except one dated February 12, 1916) were issued between April 27, 1917, and December 20, 1920, within the period of the issuance of the stocks in question. There were 49 of these checks, one for nearly every month, and sometimes two. Hogg cashed and received the proceeds of 34 of them aggregating $34,088.43 at the Union Trust Company, and of the other 15 aggregating $22,817.08, at the Corn Exchange National Bank. There is no direct proof of what he did with the proceeds. The inference that he used the same to buy stocks for Eckhardt's benefit rests almost wholly, if not entirely, on conjecture. There is a singular absence of any documents or memoranda supporting the inference. Hogg closed his bank account at the Union Trust Company July 21, 1920, and opened an account with the Corn Exchange National Bank, which he maintained until his death. One of the singular features disclosed by the evidence is that the Union Trust Company's records of Hogg's account were missing, and hence could not be produced to show his deposits and withdrawals during the period of three years' time when said checks were cashed there.

The reasonable market value of all the shares of stock in question on April 1, 1921, was $139,627.50. That of the Union Carbide stock awarded to Eckhardt was nearly $70,000 of that amount. There was no proof of their value at any previous date, except that the witness Ray said he sold some Carbide stock the previous year for a fraction over $40. But while we take notice that stocks fluctuate in value, we cannot presume in favor of defendant, upon whom the burden of proof is cast, that the market price of the stocks at the time of their purchase, which certainly was capable of proof, was any less than the stipulated prices in April, 1921. If proof on that subject would have favored defendant it is singular that it was not offered.

Of the 1320 shares of Carbide stock 250 were issued in 1917, 250 in 1918, 600 in 1919, and 220 in 1920. Estimating the value of the Carbide stock at $53.12½ a share (its market value April 1, 1921) and comparing the values with the amount of Eckhardt's checks cashed by Hogg in the respective years the account would stand approximately as follows:

| In the year, 1917, | Checks | $ 6,884.15 | Stocks | $13,280.00 |
|---|---|---|---|---|
| ,, ,, ,, 1918, | ,, | 12,539.23 | ,, | 13,281.00 |
| ,, ,, ,, 1919, | ,, | 14,337.77 | ,, | 31,875.00 |
| ,, ,, ,, 1920, | ,, | 23,193.81 | ,, | 11,685.00 |
| | Total | $56,954.96 | Total | $70,121.00 |

The inference sought to be drawn that these checks were given for the Carbide stock is no more plausible or to be presumed than that they were given for the other stocks issued in the same interval of time, to which Eckhardt also lays claim, or that they were for money due and owing from Eckhardt. (*Bromwell v. Estate of Bromwell*, 139 Ill. 424, 426.) The theory of the defense is that he paid for all of the stock in question. But inasmuch as 1200 shares of the Sinclair

stock were issued in 1918, valued according to the stipulation aforesaid at over $25,000, and only 500 of the Carbide stock up to the end of that year, valued about the same, and the checks for the year were insufficient to pay for more than half of either, it is difficult to perceive upon what theory it can be held that Eckhardt's checks were intended as payment for the Carbide stock only. There is no correspondence between the dates of the checks and those of the certificates, or in their respective amounts, that suggests they were intended as such payments. Prior to the issuance of the first 250 shares of Carbide stock, which was on November 19, 1917, Eckhardt's checks amounted to about $7,000. But the stock then issued was worth, as aforesaid, over twice that amount. At the end of 1919, the Carbide stock that had then been issued was worth $25,000 more than the amount of his checks up to that time. In July, 1920, when Draper visited Eckhardt's safety deposit box and claims to have seen the stock in question Eckhardt's checks had amounted to less than $46,000. But at that time there had been issued 2300 shares of Sinclair stock of that value, also 1200 shares of the Carbide stock worth over $60,000, all of the Steel Foundries stock worth over $15,000, and the Utilities stock worth over $1,100, a total value of nearly $125,000 of stock. Is it consonant with reason that Hogg had then delivered over stock of such value to Eckhardt for only $46,000? If the stock had been purchased at a less market value it was not difficult for Eckhardt, upon whom the burden rested to show a resulting trust, to prove the market value of these standard stocks on the dates the certificates were issued and thus account for a discrepancy of nearly $80,000. Without other testimony than was adduced in this case these figures are not reconcilable with such a claim. To support it requires basing presumption upon presumption and supplementing meager facts with conjecture.

But it appears that while the stock thus stood in Hogg's name he received and cashed dividend checks thereon for over $13,500 on the Carbide stock, and received as dividends on the Steel Foundries two certificates for 30 and 63 shares, and $400 in checks, and two dividend checks of $100 each on the Stewart-Warner stock. Only one of these checks, that issued and received while Hogg was confined to the hospital from the brain operation, appears to have been indorsed by him and cashed by Eckhardt. But who ultimately got the proceeds therefrom is not shown. It appears, too, from deposits made to Hogg's account in the First National Bank, that he received and cashed dividend checks subsequent to the time Draper claims to have seen the stock in Eckhardt's box. Only by testimony of Eckhardt, which if not rejected for incompetency, must be given little weight in view of his interest and that no denial can come from the grave, does it appear that Hogg handed over to him the proceeds from any of the dividend checks. Such an important fact, unsupported by any documentary data of either the deceased or defendant, cannot be deemed established by such manifestly incompetent testimony, whether left in the record through inadvertence or otherwise.

Can it be said that the character of the proof adduced by Eckhardt, opposed as it is by so many significant and suspicious circumstances, meets the requirement of the law as to its probative value? A close scrutiny of the record, which the rule of practice imposes in such a case, reveals so many circumstances inconsistent with his claim as to compel the conclusion that it does not.

Ray, an intimate friend of both Hogg and Eckhardt, called as a witness by complainant, had also invested in Carbide stock. He testified to the effect that Hogg informed him in 1919 that he had purchased Carbide

stock as the result of certain information obtained through family connections. He also testified that shortly after June 28, 1921, when Ray sold his Carbide stock, Eckhardt said he was foolish to sell it, and remarked: ''Of course I didn't sell mine; I only own 20 shares. I am investing my money in certificates of indebtedness;'' that after Hogg's death Eckhardt asked him if Mrs. Hogg and her brother had been down to see him, saying that they thought ''Lloyd had got money planted every place, and if they ask you of any stocks that he has had, just tell them that you don't know. Don't give them any information at all, * * * impress upon her mind the value of this American Spiral Pipe Stock that he left her; that is more money than she ever dreamed of having anyway.'' Eckhardt himself testified that he furnished them ''as little information as possible.'' He admitted having many conversations with Ray but denied these alleged conversations and numerous other statements attributed to him by Ray, many of which were of an entirely harmless character. One of the tests usually applied in such a case as to the relative weight of the testimony is the distinction to be made between that given by a disinterested witness and that by a litigant party to the record. *(Podolski v. Stone,* 186 Ill. 540, 547.) If both be deemed equally credible and unimpeached ''the equilibrium may be destroyed by surrounding circumstances.'' *(Bonnell v. Wilder,* 67 Ill. 327, 330.)

Other circumstances than those alluded to may be mentioned.

Beginning with his answer we find Eckhardt conceals his defense, which honesty and sincerity should have prompted him to disclose *(Crone v. Crone,* 180 Ill. 599, 606), and denies therein knowledge of important matters which the evidence discloses he knew to be true. In it he states that he is not advised that Hogg shortly prior to his death was possessed of large

sums of money received by way of dividends from his shares of common stock for the American Spiral Pipe Company, and yet he made out Hogg's income tax return on April 14, 1921, which showed dividends for the preceding year on that stock of $94,400. He also alleged in his answer that he was not advised that Hogg received $73,000, or any other sum, from the sale of that company's preferred stock, but he was present when Hogg indorsed and delivered the certificates to the purchaser, and made out his deposit slip therefor. In it he denied Hogg was mentally incapacitated at any time to care for and manage his own estate, but he was daily present during the intervals Hogg was so found to be incapacitated, and knew he was strapped to his bed the day he arranged for the transfer of the stock in question. We might advert to his numerous unsupported denials of many prejudicial facts testified to by many witnesses, and inconsistencies in his testimony, but it would extend this opinion beyond reasonable limits.

And here we may pertinently make other inquiries which the record does not satisfactorily answer. Why, if Eckhardt was the real owner of the stock in question, did he include the dividends thereof for the year 1920 in Hogg's income tax return which he made out because of Hogg's illness? An amendment to his answer avers that he included them at the direction of Hogg. But that is consistent with Hogg's ownership. If Eckhardt in fact owned the stock he owned the dividends thereon, and his personal interest as well as common honesty should have prompted him to pay the income tax instead of permitting Hogg to pay it. While he presented accounts to Hogg giving details of expenditures he made for him during and after Hogg's illness, and proof of payment thereof, he produced no proof that he ever credited Hogg with the income tax thus paid by Hogg which, according to his

claim, should have been paid by himself. While he explained that he did not include such dividends in his own income tax return for the year 1920 because they were issued in Hogg's name, and presumably, in the absence of any proof of his income returns for previous years never included them in his own tax returns, yet to support his claim to the stock he testified, as before stated, that Hogg gave him the proceeds of the dividends as he cashed them. It might reasonably be expected that if Eckhardt received over $16,000 in cash from such dividends it would appear somewhere in tax returns or in his book account or bank account. But the court was not enlightened by their production. Nor was his financial ability to pay out so much money disclosed otherwise than by the checks themselves. For aught that appears to the contrary they may have been given for other purposes, or the proceeds may have found their way back into his own account. There is a significant void of corroborative or documentary evidence to support his solitary word with respect to matters of such magnitude and consequence as would ordinarily be evidenced in some form of writing.

It does not, however, commend Eckhardt's integrity (if we are to consider his incompetent testimony allowed to remain in the record), that the deposit boxes rented jointly in his and Hogg's name were found empty after Hogg's death, especially when he was the last to visit them, and hastened from Hogg's deathbed to open one of them before it could be visited under the forms of law. It must be assumed that they were rented for the usual purpose of having something deposited therein in which they either had a common or a joint interest, or with respect to which they held a relation of trust and confidence. The hinted explanation that two boxes thus rented jointly in two different places were rented merely to hold

private letters is more plausible than persuasive. The want of a satisfactory explanation by Eckhardt to the representatives of the estate, his sudden visit to one of the boxes almost as soon as he could leave Hogg's deathbed, his failure to disclose at once the existence of the other, the absence of any data left by Hogg, or kept by Eckhardt himself, to support such an unusual claim, his admission that in response to inquiries by Mrs. Hogg and her brother respecting the condition of the estate he gave them as little information as possible, all cast a cloud of doubt and distrust upon his claim.

While the evidence discloses eccentricities of conduct on Hogg's part, whether attributable to his disease or not, that a man with his reputation for attention to business details and handling over $100,000 a year income for six successive years prior to his death, should leave no data as to his investments or their disposition is at least so unusual as to cause surprise if not to be incredible.

Neither Hogg nor his family was shown to be extravagant. It is somewhat significant, therefore, that there is no account of his disposition of about $350,000 of the $450,000 he received from the American Spiral Pipe Works alone in salary and dividends from 1917 to 1920, inclusive.

Eckhardt himself had certainly met with considerable business success. He was the owner of the Grasmere hotel and scheduled its value in a report to the Dun Agency, July 8, 1920—purporting in fact to be his own financial condition—at nearly $100,000. His bank account was carried in its name. Yet he did not then include among his assets any of the stock in question, which Draper claimed to see a week later in his possession, and which was valued a year later at about $140,000. Seemingly a man of such resources would not have been neglectful of some writing that

would support his claim to so much property. Except from the offered but unconvincing excuse that he wished to conceal his stock investments from his wife, it remains unexplained why Eckhardt should not have purchased the stock in his own name. He appears to have bought some from Draper. It somewhat baffles inquiry, too, that if the purchase of the stocks in question was intended for his benefit, he should have acted as a witness, an act usually performed by a disinterested party, and not have been named as the transferee. Even if he wished to conceal his ownership from his wife he could still, if named as transferee, have held or sold the stock without her knowledge. Rather under such circumstances would the presumption obtain that having so witnessed Hogg's assignment in blank he was not intended to be the transferee.

It may be unfortunate for Eckhardt that since death has sealed the lips of Hogg the law has closed his own. But we need not dwell upon the reason and justice of the rule which prevents him from making any explanation of these prejudicial circumstances and from answering the inquiries that suspicion so pertinently presents. It is sufficient to say that so long as they remain unanswered, proof of defendant's claim cannot be deemed clear and convincing.

Accordingly the decree will be reversed so far as it awards to Eckhardt the Carbide stock and requires complainant to pay a portion of the costs; otherwise the decree will be affirmed. The cause will be remanded for entry of a decree in conformity with this opinion.

*Reversed in part and affirmed in part, and remanded with directions.*

GRIDLEY and SCANLAN, JJ., concur.