**Ida G. Hogg, Individually and as Administratrix of the Estate of Lloyd W. Hogg, Deceased, Appellant, v. Robert Eckhardt et al., Appellees.**

**Gen. No. 35,804.**

508

Opinion filed October 4, 1932.

ALBERT FINK and FRANCIS M. LOWES, for appellant; HERBERT HAASE, HENRY L. HANLEY, HUBERT E. HOWARD, E. BENTLEY HAMILTON, HENRY N. SHABSIN and GEORGE N. B. LOWES, of counsel.

COOKE, SULLIVAN & RICKS and GEORGE H. MASON, for certain appellee; GEORGE A. COOKE and EDWARD H. FIEDLER, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal from an order of the superior court of Cook county, entered October 30, 1931, denying complainant's motion, supported by her sworn petition and certain affidavits and exhibits, for leave to file a bill of review on the ground of newly discovered evidence to review a final decree of the court, entered March 26, 1931, in accordance with the final decision and mandate of the Supreme Court. (*Hogg v. Eckhardt,* 343 Ill. 246.)

The litigation has been pending for more than 10 years. On August 4, 1921, Lloyd W. Hogg died intestate. On August 30, 1921, complainant (his widow), individually and as administratrix of his estate, and George W. Hogg, a son (who subsequently died), filed their verified bill against Robert Eckhardt for the recovery of certain shares of stock alleged to have been owned by Lloyd W. Hogg in his lifetime, and also alleged to have been assigned and transferred by him to Eckhardt on or about April 6, 1921, without any consideration and at a time when Hogg was mentally incompetent or when a fiduciary relation existed between him and Eckhardt. Subsequently an amended

verified bill was filed, and, after Eckhardt and the corporations which had issued the stock had filed their answers, the cause was referred to a master in chancery before whom a mass of oral and documentary evidence was introduced. The stocks sought to be recovered consist of 1320 shares of the Union Carbide and Carbon Corporation; 2486 shares of the Sinclair Consolidated Oil Corporation; 593 shares of the American Steel Foundries; 100 shares of the Stewart-Warner Corporation; and 63 shares of the Middle West Utilities Company. In Eckhardt's answer he denied that Hogg ever owned the stocks or that Hogg had assigned and transferred them to him on April 6, 1921, or at any time when Hogg was incompetent, and alleged that he (Eckhardt) was "at all times" the owner of the stock. He further alleged that long prior to April 6, 1921, Hogg assigned all of the shares and delivered them to him. He further denied that Hogg was mentally incompetent or that a fiduciary relation existed between Hogg and him, but admitted that they had been very warm and close friends for many years. He further denied that the assignments of the stocks by Hogg to him were without consideration or that complainant or Hogg's heirs were entitled to any of the stocks. On January 10, 1927, the master made a lengthy report (filed April 19, 1927), recommending that complainant's bills be dismissed for want of equity. After all the evidence had been taken and after the master's report had been filed, complainant filed an amendment to the 6th paragraph of her bill, to which amended paragraph Eckhardt filed an answer. On the hearing before the chancellor exceptions to the master's report were sustained in part and overruled in part, and, on July 14, 1927, a decree was entered finding that Eckhardt was the owner of the Carbide stock, but that complainant was entitled to all the other stocks in controversy. Thereafter both parties per-

fected appeals to the Appellate Court, and on June 19, 1928, this division of the court, for reasons stated in its opinion, reversed the decree of the superior court "so far as it awards to Eckhardt the Carbide stock. and requires complainant to pay a portion of the costs," and adjudged that in other respects the decree be affirmed and that the cause be remanded to the superior court "for entry of a decree in conformity with this opinion." (*Hogg v. Eckhardt*, 249 Ill. App. 346, 367.) Subsequently, on certificate of importance being granted, appeals were perfected in the Supreme Court, and on February 18, 1931, the Supreme Court rendered its final decision wherein it was adjudged that "the judgment of the Appellate Court is reversed and the decree of the superior court of Cook county is affirmed in part and reversed in part and the cause is remanded to the superior court, with directions to enter a decree awarding all the stock in controversy to appellant (Eckhardt), except the 100 shares of Stewart-Warner stock, which will be awarded to appellee." (343 Ill. 246, 268, 269.) On March 26, 1931, the final decree of the superior court, in accordance with said decision and the mandate of the Supreme Court, was entered.

In complainant's petition, sworn to on June 25, 1931, and presented to the court on July 11, 1931, for leave to file her bill of review, after outlining the prior proceedings, she alleges that since the rendition of the first decree of the superior court of July 14, 1927, "and shortly after October 30, 1930," she discovered "new matters of consequence" in the cause. Then follow numerous paragraphs stating in detail the claimed newly discovered evidence. The substance of the petition is that through the efforts of one Nathanial Hawkins, an accountant, and others, an old bank account of Hogg with the Union Trust Company (a Chicago Bank) from October 11, 1909, down to September 5,

1918, and contained in so-called "Boston ledgers" of the bank, had been discovered, and that with the aid of the account she would now be able to prove, if given the opportunity, that Hogg had himself paid for some of the stocks in controversy (i. e., the Carbide stock) long before the issuance of the so-called "Grasmere" checks (mentioned in the final decision of the Supreme Court as the likely medium through which Eckhardt had paid Hogg for the stocks)—thus controverting Eckhardt's claim, as pleaded in his answer, that he was "at all times" the owner of the stocks. The petition alleges that said ledgers "extend to and no further than September 5, 1918"; that all deposit slips, showing the deposits in all accounts in the bank including the account of Hogg prior to June, 1919, have been destroyed; and that "there are no records whatsoever in the bank by which the account of Hogg with the bank, for the period from September 5, 1918, to the closing out of said account on July 21, 1920, may be reconstructed or determined." The petition further alleges:

13. That petitioner did not know, "and could not by reasonable diligence have known," of said new matters, "so as to make use thereof in said cause previous to and at the time of said hearings before the master and chancellor and at the date of the original decree herein" (July 14, 1927); that she first learned thereof from Nathanial Hawkins "at the time aforesaid" (after October 30, 1930); that shortly after Hogg's death she requested of Eckhardt, "who had been in a fiduciary capacity to Hogg from at least September 23, 1920, to and until the death of Hogg on August 4, 1921, and who during said period was thoroughly acquainted with the business affairs and dealings of Hogg," information regarding Hogg's business affairs, and particularly regarding said shares of stock; that Eckhardt neglected and refused to furnish

such information; that petitioner's solicitors advised her that after thorough inquiry they had been unable to obtain evidence as to where Hogg had obtained the money which went to purchase the stocks mentioned in her amended bill and that they had learned from employees of the Union Trust Company that the records of Hogg's account with that bank, for the period prior to July 22, 1920, had been lost and were not available; that she caused J. C. L. Haas and Clarence T. Anderson, employees of the bank, to testify before the master, and that they testified that after a careful search the records could not be found; that she "has never been satisfied" with the explanations that said records had been lost; that she "continuously requested her solicitors and her accountant to find out what had become of said bank account and of the $40,000 worth of Liberty Bonds that Hogg reported that he owned in his income tax returns prior to his death"; that "about a year and a half ago" (i. e., about December, 1929) petitioner learned that the bank had moved its quarters; that she *"then* requested said Hawkins to make further inquiry to ascertain if during the removal the bank account had been found or if any records had been found having to do with said bonds"; that "at the same time" she also requested Hawkins to inquire of all the large brokerage concerns in Chicago where Hogg had purchased the bonds or sold them; that Hawkins reported from time to time that he was making investigations; and that about October 1, 1930, he informed petitioner that he had learned of said loans made to Hogg by the bank, and later informed her that he "had learned of other matters and things indicating that Hogg had purchased and paid for the stocks aforesaid."

14. That "said new evidence discovered is of vital importance, and no decree would have been entered in the cause against petitioner had said evidence been available and introduced in her behalf"; that the final

decision and opinion of the Supreme Court, and the decree of the superior court entered in March, 1931, pursuant to the direction of the Supreme Court, "were *premised* upon the finding that there was no evidence that Hogg had purchased said stock with his own money, and that, as alleged in Eckhardt's answer to the amended bill, said stock was all purchased by Hogg for the use and benefit of Eckhardt, and Eckhardt paid to Hogg the purchase price of each and every share of stock so purchased"; that the foregoing new evidence "proves that Hogg purchased and paid for said shares of stock from and out of moneys belonging to him, and not from or out of moneys furnished to him by Eckhardt to purchase the same"; that during the hearing of the cause before the master, Eckhardt offered to prove that he had previously bought stock through Hogg, that stocks "took a great drop," that Mrs. Eckhardt raised objections as to Eckhardt purchasing stocks, that "arrangements were made" between Eckhardt and Hogg that thereafter stocks purchased by Eckhardt should be issued in Hogg's name, and that pursuant to said arrangements the stocks in controversy were purchased for Eckhardt in Hogg's name; that the final opinion of the Supreme Court, and the final decree of the superior court of March 26, 1931, *"are based upon the premise* that the substance of Eckhardt's said offer was sustained in the record of this cause by the so-called Grasmere Hotel checks, the first of which was issued February 12, 1916, in the sum of $919.94, and the second of which was issued April 27, 1917, in the sum of $657.37"; that the newly discovered evidence "proves that said Carbide stock was acquired by Hogg as early as 1913, more than two years prior to the issuance of said first so-called Grasmere check, and almost four years prior to the issuance of said second so-called Grasmere check"; and that the newly discovered evidence "could not possibly be presented to, or relief thereon granted by, any court

until the entry herein of the decree of March 26, 1931, in accordance with the mandate of the Supreme Court.''

The prayer of the amended petition is that ''leave be granted petitioner to file herein her bill of review for the purpose of having said decree reviewed, reversed and set aside,'' etc. Accompanying the petition are affidavits of Nathanial Hawkins, the accountant; Francis M. Lowes, one of the solicitors for complainant; Herbert Haase, Henry L. Hanley and Herbert E. Howard, other solicitors for complainant; and J. J. Buechner, auditor of the Union Trust Company. These affidavits tend to support some of the allegations of the petition.

The following are some of the statements or holdings of the Supreme Court in its final decision, as reported in *Hogg v. Eckhardt,* 343 Ill. 246: After stating in substance the allegations as contained in complainant's original bill and amended bill, and in the answer of Eckhardt thereto, it is said (p. 249):

''It was upon these pleadings that all the evidence was introduced before the master. The verified bills expressly asserted and relied upon an actual assignment and delivery of the stocks by Hogg to appellant (Eckhardt) but sought to set them aside on the ground of lack of consideration for the transfers and because of the alleged mental incompetency of the deceased and the existence of a fiduciary relation.''

After commenting upon the effect of the amendment to the 6th paragraph of the amended bill it is said (p. 250):

''On the issues made by the pleadings, therefore, the sole question in this case is whether Hogg's transfers to appellant were made at a time when he was mentally incompetent or when a fiduciary relation existed, and without consideration.''

After outlining certain facts and particularly the various times when the stocks in controversy were issued, it is said (pp. 251, 252):

"The stocks were purchased in comparatively small lots from time to time, the transactions being more than fifty in number over the three-year period (i. e. from 1917 to 1920). All the shares were issued in the name of Lloyd W. Hogg, and they are all endorsed by him on the form of assignment on the back of the certificates."

In discussing the question of Hogg's mental incompetency it is said (pp. 252, 253):

"Many witnesses, both lay and medical, testified as to Hogg's mental and physical condition. After a careful consideration of this evidence we are of the opinion that there were only four occasions between February 1, 1921, and the date of Hogg's death (August 4, 1921) when he was incompetent to understand and transact ordinary business, namely, a day or so after February 4, . . . .; a day or so after March 15, . . . .; a period of a week to ten days after the decompression operation of March 31 was performed, and at other times between March 11 and April 7, 1921, when he had been given morphine and codein."

"It is stipulated by the parties that Hogg signed his name on the back of each certificate of stock here in question at about the date of its issuance, and that by the date of issuance is meant the date which the certificates of stock, respectively, bear upon their face. These certificates of stock were all issued at times when it was shown by the evidence that Hogg was not incompetent to understand and transact ordinary business. The law has been generally established that as between the parties the transfer of stock by delivery of the certificate, with power of attorney or endorsed in blank, passes title without the transfer on the books of the company. . . . Although these transfers on

the books of the corporations occurred in April, 1921, the record shows that the certificates had been assigned and delivered to appellant long prior thereto and at a time when Hogg was mentally competent. Hogg's incompetency at the time of the transfers on the corporation books was entirely immaterial, as it is the settled rule that the fact a former owner is insane, or even dead, at the time of such transfers has no effect on the validity of the transfers. . . . This disposes of the question of Hogg's incompetency.''

The court then enters upon a discussion concerning the ownership of the stocks and the question of their transfer by Hogg to Eckhardt at times when a fiduciary relationship existed, saying in part (pp. 253–255):

''Possession of stock certificates endorsed in blank is *prima facie* evidence of ownership in the possessor, and the burden of producing evidence on the question of ownership rests upon the person disputing such ownership. . . . This burden may, however, be shifted to the possessor by proof that he obtained such possession from the prior owner at a time when a fiduciary relation existed between him and the prior owner. . . . The decree finds that a fiduciary relation existed between them from September 23, 1920, until Hogg's death on August 4, 1921. From the evidence in this record the chancellor properly limited the commencement and duration of the alleged fiduciary relation to that period, as there is no evidence which would justify a finding that any such relation existed prior to September 23, 1920. The effect of the existence of such a relation is to raise a presumption that transactions between the parties during its existence are fraudulent and void and to cast upon the one benefiting from such transactions the burden of proving they were entirely fair and not the result of fraud or undue influence. But, obviously, the existence of such a relation at a given time has no effect upon transactions between the parties which occurred prior to the com-

mencement of the relation. . . . Where a complainant alleges that a transaction is invalid by reason of a fiduciary relation and on that basis seeks to recover property in the possession of the defendant, relief is predicated upon the doctrine of constructive trusts, and when awarded it is on the theory that the defendant holds title as trustee for the grantor, . . . ; and in such cases it is incumbent upon the complainant to establish the claim of fiduciary relation and constructive trust by proof which is 'clear and convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion.' . . . It was therefore incumbent upon appellee (complainant) to establish by clear proof not only the existence and period of the fiduciary relation but also that the assignments of the stocks by Hogg to appellant occurred at a time when the relation existed. A careful study of the record on this subject convinces us that the evidence shows beyond doubt that except for a few shares of stock which were issued as stock dividends or pursuant to 'rights' on stocks previously issued, all the stocks in question were assigned and delivered by Hogg to appellant prior to September 23, 1920, except the Stewart-Warner stock. For this reason there can be no presumption that the transactions prior to September 23, 1920, were invalid, and the burden of proof was *not* upon appellant to show that the assignments prior to that date were fair and not the result of undue influence.''

After reviewing the testimony of Eckhardt's witnesses, Draper and Warren, the court further says (pp. 258, 259, italics ours):

*''There is no evidence in this record establishing that Hogg's funds were used to purchase the stocks.* Although his income during the years in question was very large, amounting to several hundred thousand dollars, the record shows that he disposed of the great bulk of it in other directions. The fact that the stocks were in each instance issued in Hogg's name would

raise a presumption that they were his since legal title was vested in him, but such a presumption is overcome by the undisputed and agreed fact that he assigned each certificate immediately upon its issuance in his name and that appellant was in possession of the certificates while they were in that condition. There is no evidence as to the cost of the stocks, and it is impossible to determine from the record the purchase price paid for the stocks over the four-year period from 1917 to 1921. Appellant introduced in evidence approximately fifty checks, totaling $56,905.51. They range in date from 1917 to 1920, the latest being dated December 20, 1920. These checks were drawn on two Chicago banks—Sheridan Trust and Savings Bank and Union Trust Company. They were all made payable to the order of appellant and were signed, 'Hotel Grasmere, by Robert Eckhardt.' Appellant was the owner of this hotel. Each check bore the endorsement of appellant and of the bank which cashed it. The checks were issued for varying amounts at different dates—in most cases one a month but sometimes two. The paying tellers of the Union Trust Company and the Corn Exchange National Bank, who had cashed all these checks, were called as witnesses. Hogg had an account in both banks and the paying tellers were well acquainted with him. They identified each check by the paying teller's stamp which he had placed upon it, and testified that they had cashed all the checks for Hogg without requiring him to endorse them. . . . The testimony of these bankers is convincing. It shows that without doubt Hogg received the proceeds of these checks, totaling about $57,000, during the period when the stocks in question were purchased. In several instances the record shows that on the same days Hogg cashed these checks he deposited approximately the same or a greater amount in his checking account in one or the other of these banks. Hogg's bank account on the books of one of these banks

has disappeared, and there is therefore no showing that the proceeds of all these checks were so deposited. The master found that Hogg cashed all the checks and 'received the proceeds thereof.' "

After considering the evidence regarding the final disposition of dividends received on the stocks, and after commenting *seriatim* upon the evidence concerning each of the stock issues, the court further says (p. 263):

"There were twenty-seven occasions when Hogg endorsed the stock certificates over a period of three years. The stock certificates themselves show that the endorsements occurred in appellant's presence on each of these numerous occasions. As to some of the certificates the evidence is that they were delivered by Hogg to appellant at the time when they were endorsed. As to the others, with the exception of the Stewart-Warner stock and some of the stock which was issued as dividends, while the record does not expressly show the dates of delivery it does show that they must have been delivered to appellant prior to July, 1920, for they were in his possession as early as that date. Appellee thus in the main failed to prove that the transactions occurred during the period of alleged fiduciary relation. On the contrary, the proof shows the transactions occurred at a time when clearly no such relation existed. We are of the opinion that the facts and circumstances established by this record show that appellant was the owner of all the stocks in controversy except the Stewart-Warner stock. The fact that Hogg assigned all these stock certificates at the times they were issued, or soon thereafter, is in itself a strong circumstance indicating that he was not the owner, when the evidence shows that he did not follow this practice as to any stocks which were admittedly his own property."

And the court further says (pp. 264, 265, italics ours):

"After the record transfers of all the stocks to appellant's name the dividend checks were issued direct to appellant instead of Hogg, and although these amounted to a considerable sum prior to Hogg's death, there is nothing in the record to indicate that Hogg did not fully acquiesce in both the record transfers and the receipt of the dividends by appellant. *Appellant made payments to Hogg by checks totaling about $57,000, and although there was no evidence directly establishing that these payments were made for the purpose of having Hogg purchase the stock for appellant, the only reasonable conclusion is that they were for that purpose.* The master expressly found that 'the receipt by Hogg of these large amounts has not been explained or accounted for in any way,' and that appellant's testimony was 'not admissible to explain them or to show other payments, if any, which may have been made by him.' Many other circumstances disclosed by the record also tend to show that appellant was the owner of the stock, but it is unnecessary to consider them."

Concerning Hogg's income tax return for the year 1920, prepared by appellant, the court further says (pp. 266, 267, italics ours):

"Another circumstance relied upon by appellee relates to Hogg's income tax return for the year 1920. This return was prepared for Hogg by appellant April 14, 1921, after Hogg had left the hospital. Included in the return were dividends received by Hogg during 1920 on the stocks in question, and it is argued that this establishes that Hogg owned the stocks in his own right. There would be force in this contention in the absence of the other evidence we have alluded to, but in view of the uncontradicted evidence as to Hogg's practice in cashing the dividend checks rather than depositing them, and the uncontradicted evidence that he paid the amount of dividends to appellant as they came in, the inclusion of these dividends

in Hogg's return does not prove that he owned the stocks. . . . All the other facts and circumstances above mentioned with respect to Hogg's immediate endorsement of the stock certificates, his payment of these dividends to appellant and appellant's checks to Hogg, *in our opinion preclude the claim that Hogg owned any of the stocks,* or that the income tax return established such ownership.''

The law of this State as regards the granting of leave to file a bill of review on the ground of newly discovered evidence is well settled. In *Elzas v. Elzas,* 183 Ill. 132, 134, it is said:

''Leave to file a bill of review for newly discovered evidence is not granted as a matter of right, but granting or refusing such leave rests in the sound discretion of the court to which the application is made. The newly discovered evidence upon which the court is asked to review and reverse the former decree must not be cumulative, and must be of an important and decisive character, if not conclusive. It must be such as would apparently have produced a different result had it been known and brought before the court. (*Griggs v. Gear,* 3 Gilm. 2; *Walker v. Douglas,* 89 Ill. 425.) The petition will not be granted except upon affidavit satisfying the court that the alleged new matter was not known to the petitioner, and could not have been discovered and produced or used by him by the exercise of reasonable diligence, before the entry of the decree sought to be reviewed. . . . If the petitioner has been negligent in discovering and producing the evidence at the former hearing his negligence will bar any relief. He must show that the evidence was such that with the use of reasonable diligence he could not have known of it before the hearing, and the general rule is, that evidence which tends simply to impeach testimony given on the hearing will not be sufficient to sustain a bill of review. (*Boyden v. Reed,* 55 Ill. 458.) When the petition is presented the court

considers its statements, and the affidavits in support of it, and the record in the original case. The court then, upon looking at the whole case, exercises a sound judicial discretion, and unless such discretion has been abused the decision will not be disturbed. 'The true rule would seem to be, that unless there has been an abuse of the fair discretionary power with which the circuit court has been invested in the matter of such applications its decision should not be disturbed.' (*Schaefer v. Wunderle*, 154 Ill. 577, 582; *Stockley v. Stockley*, 93 Mich. 307.)''

In *Lewis v. Topsico*, 201 Ill. 320, 338, after quoting with approval what is said in the *Elzas* case, *supra*, as to the negligence on the part of a petitioner, in not discovering and producing the evidence at the former hearing, barring relief on a motion for leave to file a bill of review, the court quotes from Lord Eldon in *Simpson v. Watts*, 6 Rich. Eq. (S. C.) 364, as follows: ''The question always is, not what the petitioner knew, but what, using reasonable diligence, he might have known.'' In *Corbly v. Corbly*, 304 Ill. 323, 327, 328, it is said: ''The bill of review for newly discovered evidence is not favored by the courts. Its allowance is not a matter of right in the party but rests in the sound discretion of the court, to be exercised cautiously and sparingly, and only under circumstances that demonstrate it to be indispensable to the merits and justice of the cause.'' (See, also, *Nestor Johnson Mfg. Co. v. Alfred Johnson Skate Co.*, 266 Ill. App. 130, 137, 139; certiorari denied.)

In here urging in the present suit that the superior court abused its discretion in denying complainant's motion for leave to file her bill of review, complainant's counsels' main contention is that the newly discovered evidence, as set forth in complainant's petition and affidavits, ''will produce a different result or decree in the case.'' In their discussion of the contention they first mention certain statements or hold-

ings in the Supreme Court's opinion (which in our review of that opinion we have above italicized) viz.:

(a) "There is no evidence in this record establishing that Hogg's funds were used to purchase the stocks."

(b) "Appellant made payments to Hogg by checks totaling about $57,000, and although there was no evidence directly establishing that these payments were made for the purpose of having Hogg purchase the stock for appellant, the only reasonable conclusion is that they were for that purpose."

(c) Certain enumerated facts and circumstances "in our opinion preclude the claim that Hogg owned any of the stocks."

And then counsel argue in their brief that

"It is *conclusive* that the *premise* of the whole decision of the case, on which the present decree of the court was entered, rests upon those parts above quoted, (a), (b) and (c), as to the ownership; and that the decision and the decree, awarding the stocks to defendant (except the Stewart-Warner stock), rests upon the *question* as to who was the owner of the stocks, to be determined by the facts as to who furnished the consideration to purchase them."

We cannot agree with the contention or the argument. Early in the opinion of the Supreme Court it is stated that under the issues as made by the pleadings "the sole question in this case is whether Hogg's transfers to appellant (defendant in the present suit) were made at a time when he (Hogg) was mentally incompetent or when a fiduciary relation existed, and without consideration." This ultimate question was finally decided, as appears from the above quoted portions of the exhaustive opinion of the court, adversely to complainant, except as to the Stewart-Warner stock, and, as we read the opinion, said decision of the court does not conclusively rest upon the "premise" or "question" as stated by complainant's counsel. Further-

more, we agree with the statements of defendant's counsel, contained in their brief here filed, viz.: "The new evidence, at most, would tend to prove only that Hogg drew checks on his bank account to pay the purchase price of *some* of the stocks. It would not tend to prove the allegations of complainant's bills that Hogg's assignments to defendant were without consideration. Nor would it tend to prove the no less essential allegations of the bills that Hogg's assignments to defendant were made at a time when Hogg was incompetent and during the existence of the alleged fiduciary relation." Furthermore, after reviewing said opinion of the Supreme Court and the record in the present suit, we are of the opinion that the claimed newly discovered evidence is such as should be regarded as but cumulative to that introduced before the master in the original action.

And we are of the opinion that complainant's petition and the affidavits accompanying it do not sufficiently show that complainant exercised due diligence in discovering and producing the claimed new evidence. Complainant alleges in the petition that "shortly after October 30, 1930," through the efforts of her accountant (Hawkins) and others, she first discovered the "new matters." This was more than nine years after Hogg's death and more than three years after the master had filed his report (April 19, 1927), and more than three years after the entry of the original decree (July 14, 1927), which was in complainant's favor except as to the Carbide stock. One of the affidavits discloses that no attempt was made to obtain any information regarding Hogg's bank account with the Union Trust Company until May 20, 1924. This was after much evidence had been taken before the master. Another of the affidavits discloses that the first attempt to obtain information from stock brokerage concerns, relative to Hogg's dealings therewith in the purchase or sale of stocks, was after Decem-

ber 23, 1926, when the opinion of the Supreme Court in *Hogg v. Hohmann* (323 Ill. 545) was handed down. This was about the time that the master in the original action had issued his report (January 10, 1927), in which he recommended that complainant's bill be dismissed for want of equity. And the information obtained from the stock brokers was available at all times since August 30, 1921, when complainant's original bill was filed. And there are other facts and circumstances contained in the present record which convince us that the superior court did not abuse its discretion in denying complainant leave to file her bill of review, both on the ground of her lack of due diligence in discovering and producing the claimed new evidence and on the ground that said evidence, if heard, could not "produce a different result or decree in the case." And we think that what was said by Lord Eldon upon a similar petition, in *Young v. Keighly*, 16 Ves. 348, 349, and quoted in *Society of Shakers v. Watson*, 77 Fed. 512, 523, may here appropriately again be quoted, viz.:

"It is most incumbent on the court to take care that the same subject shall not be put in a course of *repeated* litigation, and that, with a view to the *termination of suit*, the necessity of using reasonably active diligence in the first instance should be imposed upon parties. The court must not, therefore, be induced by any persuasion as to the fact that the plaintiff had originally a demand, which he could clearly have sustained, to break down rules established to prevent general mischief at the expense even of particular injury."

The judgment of the superior court of October 30, 1931, denying complainant's motion for leave to file her bill of review, is affirmed.

*Affirmed.*

KERNER, P. J., and SCANLAN, J., concur.