(Nos. 17607-08-17631.—Judgments affirmed.)
Ida G. Hogg, Admx. *et al.* Plaintiffs in Error, *vs.* Julia
Cummings Hohmann *et al.* Defendants in Error.—Ida
G. Hogg, Admx. *et al.* Defendants in Error, *vs.* Julia
Cummings Hohmann *et al.* Plaintiffs in Error.

*Opinion filed December 23, 1926.*

Gifts—*what is sufficient to overcome presumption of delivery from blank indorsement of stock—burden of proof.* Possession of certificates of stock endorsed in blank is *prima facie* evidence that the possessor is the owner, and the burden is on an administratrix claiming the stock as property of the estate of the deceased endorser to prove that the possessor is not the owner; but the facts that the deceased had received the dividends on the stock and that it was not shown to have been out of his possession or control until after an illness which affected his mental capacity to transact business are sufficient to overcome the presumption where the evidence for the party in possession of the stock is unsatisfactory and contradictory.

Writ of Error to the Second Division of the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. Hugo M. Friend, Judge, presiding.

Albert Fink, Francis M. Lowes, and Henry N. Shabsin, for Ida G. Hogg *et al.*

Newby & Murphy, (Albert E. Isley, of counsel,) for Julia Cummings Hohmann *et al.*

Mr. Justice Dunn delivered the opinion of the court:

The circuit court of Cook county granted relief upon a bill filed by Ida G. Hogg, individually and as administratrix of the estate of Lloyd W. Hogg, and George Hogg, by his next friend, to recover assets of the estate of Hogg. The assets involved were 1000 shares of the capital stock of the Anaconda Copper Mining Company and $100,000 of United States Liberty bonds. The bill averred that these

323—35

securities were the property of Hogg in his lifetime and were obtained from him by Julia Cummings Hohmann without consideration while he was mentally incompetent and while she sustained a confidential relation to him. Various transfers of the stock were alleged and new certificates for the 1000 shares were alleged to have been made to Theodore P. Keller. It was also alleged that Mrs. Hohmann had delivered to Dorothy Yetman, without consideration, $5250 of the Liberty bonds. The court decreed that the 1000 shares of Anaconda stock certificates which were issued and were in the name of Keller should be transferred to Mrs. Hogg, as administratrix of the estate of Lloyd W. Hogg, deceased, as the owner; that Mrs. Hohmann, within ten days from the date of the decree, deliver to the clerk of the court $94,750 of Liberty bonds, to be delivered to Mrs. Hogg as administratrix, as aforesaid, and upon her failure to make such delivery the administratrix might apply to the court for judgment for $94,750, with interest; that Mrs. Hohmann be enjoined from prosecuting a suit in the circuit court of Milwaukee county, Wisconsin, for the recovery of $5250 of Liberty bonds which were deposited with the clerk of the circuit court, and that Dorothy Yetman be enjoined from asserting any right or title in such bonds as against Mrs. Hogg as administratrix, as aforesaid. Keller appealed from this decree to the Appellate Court, and Mrs. Hohmann and Marion H. Keller sued out a writ of error. The appeal and the writ of error were consolidated, and the decree was affirmed as to the Anaconda stock and the $5250 of Liberty bonds deposited with the clerk of the circuit court of Milwaukee county, Wisconsin, and was reversed as to the $94,750 of Liberty bonds. Upon the separate petitions of the complainants in the original bill, of Theodore P. Keller, and of Mrs. Hohmann and Marion H. Keller, writs of *certiorari* were allowed to bring the record of the Appellate Court before us, and the three causes have been consolidated.

Lloyd W. Hogg was born in 1878 and died on August 4, 1921. He left the complainant Ida G. Hogg, his widow, and his son, George, the other complainant, who was then eighteen years old, his only heir. He had lived in the home of George Hohmann and his wife, Julia Cummings Hohmann, for three years, beginning in 1900. He paid a part of his board when he was able to do so. He always remained friendly toward them and expressed a deep sense of gratitude for their kindness to him. He addressed Mrs. Hohmann as "mother." Hohmann and his wife were divorced in 1918. Marion H. Keller is their daughter and Theodore P. Keller is Marion's husband. About 1899 J. Hall Taylor, who was a schoolmate of Hogg's at Lewis Institute, invented a machine for making spiral pipes. Hogg's father had a machine shop, and Hogg made or caused to be made a number of the small pieces in his father's shop. The two talked of going into business but could not get the necessary money. Later Taylor raised the money and started in the business. About a year afterward he decided that he wanted Hogg in the business. Hogg, who then had other employment, hesitated about accepting Taylor's proposition, and Taylor then asked Hohmann's help to get Hogg's decision. After Hohmann, with Hogg, had investigated the business and plant Hogg went into the company, which was known as the American Spiral Pipe Company. He was soon put in charge of the sales, became the treasurer of the corporation, passed on its financial arrangements, worked in financing the corporation through the difficulties which it encountered, fixed the selling prices of its products and handled all its legal work. The factory had from 175 to 220 employees. Hogg continued in the performance of these duties until January 31, 1921. On that date he owned 888 shares of the common stock and 700 shares of the preferred stock of the corporation. Beginning in 1917 his yearly income from salary and dividends had been over $110,000, his salary in 1916 and

1917 being $12,000, in 1918 $17,500, and in subsequent years $18,000. The years 1917 to 1920, Taylor testified, were the war-profit years. On January 31, 1921, Hogg was the owner of record of 1000 shares of the capital stock of the Anaconda Copper Mining Company, upon which dividends had been paid to him since 1917 by check, the last on November 20, 1920. This is the stock sought to be reached by this suit. The preferred stock of the American Spiral Pipe Company paid a dividend of eight per cent, and on February 25, 1921, Hogg transferred his 700 shares of that stock to Taylor, who paid him for it $73,500, which was deposited to Hogg's credit in the Corn Exchange Bank, making his balance then amount to $88,000. In his income tax returns for 1918 and 1919 Hogg claimed to own $40,000 in government bonds. In the spring of 1920 he picked up some Liberty bonds of the denomination of $1000 from his safety deposit box, remarking to a friend who was present, "I am not broke yet, Bill; I have still got a few of these left." He had other securities, $125,000 of which were transferred to Robert Eckhardt on April 6, 1921. He was struck and killed by an automobile August 4, 1921. Of all the securities, deposits and other property which he had possessed, his wife, who is his administratrix, found only 888 shares of the common stock of the American Spiral Pipe Company, $999.75 in the Corn Exchange Bank, about $114 in the Illinois Trust and Savings Bank, a few government bonds of small denominations and about $850 in war savings stamps.

Hogg was married to Ida Gunther in 1902. After August 1, 1920, to the time of his death they did not live together. She then went to Kentucky, where she had formerly lived, and their son attended school at Culver during the school year of 1920 and 1921. In December, 1920, Mrs. Hogg was again in Chicago and had two interviews with her husband. He urged her and her sister to go to California, and they did so, arriving there on January 28,

1921. They returned to Chicago on April 3 in response to a telephone message from Robert Eckhardt in regard to Hogg after a surgical operation on March 31, 1921. Eckhardt had been manager of the Grasmere Hotel for ten years. He had known Hogg since 1904, and for the last ten years had seen him four or five times a week, taking two meals regularly with him, one of which was at the hotel, where Hogg was the guest of Eckhardt, and the other at the Athletic Club, where Eckhardt was the guest of Hogg. After February 1, 1921, Hogg lived at the Grasmere Hotel, except for such time as he was in the hospital. Eckhardt was with him constantly during the time Hogg was at the hospital, occupying a room there adjoining the one in which Hogg was. Hogg was of medium height and athletic build. On January 31, 1921, he was living at the Athletic Club. Dr. French, who had been his physician from 1918 or 1919, was called to see him on February 1. Hogg had a severe headache and the doctor took him to the Henrotin Hospital, where he remained until the next morning and then went to the Grasmere Hotel. Drs. Brawley and Murray were called in consultation, and a day or two later Hogg was taken to St. Luke's Hospital, where the sphenoidal sinus was opened through the nose. Hogg's trouble manifested itself in a severe headache. Partial relief followed the operation for about two weeks, but it was only temporary. Dr. Mix was called into consultation, and Hogg was taken back to St. Luke's Hospital about March 14. A second operation similar to the first was performed but did not bring so much relief as the first. Drugs were administered to relieve the intolerable pain. After consultation with other doctors, the making of the Wasserman test on him and several tests of vision, a probable diagnosis was arrived at in the latter part of March that there was a tumor on the brain, and another operation was determined on. It was hoped to remove the tumor, if possible, and if it was not possible to remove it, to relieve the

pressure by a decompression operation. An incision was made immediately above the left ear in the shape of a horseshoe, with the opening in front. A cut was made through the scalp to the covering of the bone and that part of the scalp was laid back, then a cut was made through the periosteum, which is the covering of the bone, and that was laid back. With a circular saw a hole was cut through the bone, and with a similar instrument, but larger, the opening was enlarged until it extended about an inch and a half up and down and perhaps two inches from front to back. Nothing in particular was found when the operation had proceeded this far, and the covering of the brain was then cut and laid back so that the brain tissue was seen and there was no evidence of any tumor. The surgeons then took an aspirating needle and probed directly into the brain, slightly backward, and downward far enough to enter one of the sinuses of the brain and draw from it a little bloody matter, which was sent immediately to the laboratory, and the report came back in seven or eight minutes that it was normal. The surgeons did not go any farther with the operation but closed up the opening.

Dr. French testified that he believed Hogg had a tumor or lesion of the brain but could not have positively sworn to it. After the scalp was sewed back in place over the hole in the skull the brain bulged out over the sides of the opening, stretching the scalp into a protuberance one-half inch or more high. This forcing out of the brain relieved the pressure and pain caused by the tumor. The physicians who testified thought that the tumor would have eventually caused Hogg's death. The automobile accident which caused Hogg's death resulted in a fracture of the skull, and a post-mortem examination of the brain was made by the coroner's physician, who testified that on the left side a tumor was found in the back portion of the brain. The physician did not measure the tumor, but testified to his recollection that it was at least three inches or more in ex-

tent, so far as could be determined with the naked eye. It occupied the entire occipital lobe and encroached upon portions of the brain anterior. He said he was sure it must have been there at least for several months.

Hogg did not attend to any of the business of the corporation after January 31, 1921, except that, accompanied by Eckhardt, he attended a meeting of the board of directors on June 1 and talked with some of the men in the office, who noticed nothing in his conversation or behavior to make them suspect that he was mentally affected by his physical trouble. In July he signed the capital stock report which had been prepared. He revised the prices of the corporation to the Scully Steel and Iron Company, reducing the price of boiler nozzles from forty-five per cent to fifty per cent discount. He told Taylor of the revision, and the latter said to him that he had reduced the price ten per cent, but Hogg said no. Taylor then said a reduction from forty-five per cent discount to fifty per cent means a ten per cent reduction. He said "no; that is a half a point better; figure it for yourself." Taylor said that he did figure it and found that it was about one per cent to the advantage of the company.

Hogg was disturbed about his physical condition in the fall of 1920 and early in December went to Rochester, to Mayo's sanitarium, for examination. The tumor was not discovered at that time but it was found that Hogg had an enlargement of the thyroid. About the first of February a hesitancy in his speech was noticed and inability at times to recall words. Sometimes he had difficulty in thinking of the proper word to use and would make the word known by signs or in some other way. Sometimes the person with whom he was talking would know what word he wanted and would supply it, and he would say yes, and go on. If he was not helped in this way he would tell what he meant by some illustration, and sometimes he would think of the word himself and go on. Some words he could not read

in the paper. Sometimes he could tell what the words were if spelled by letters and sometimes not. He was tested on pencils and watch and keys. He knew what the pencil was but could not give the name. He told what time it was and knew what the watch was used for but could not think of the word "watch." He was suffering from aphasia, which is a partial or total loss of the power of speech, not due to difficulties in the organs of speech but to disorder in some of the cerebral centers. It may be sensory aphasia, where the victim cannot comprehend spoken or written words, one or both; or motor aphasia, which is inability to utter words correctly or connectedly while the power to read, write and understand spoken words is unimpaired; or visual aphasia, the inability to realize the meaning of written or printed words unaccompanied by any impairment of the visual organs but due to the impairment of the cortical center of vision. The growth of the tumor in the brain by reason of the excessive pressure caused severe headaches and great pain until these were relieved, partially at last, by the operation of March 31. The physicians who testified were somewhat divided in opinion as to whether or not Hogg was mentally competent to transact ordinary business. The tumor was a glioma on the left side. Dr. Patrick testified that such a tumor, extending forward into the temporal lobe, certainly might disorder a man's mentality if it was on the left side. It certainly would interfere with his speech, it almost certainly would interfere with his vision, but it would not directly involve his intellectual processes at all. A severe headache could arise in connection with a glioma occupying the whole left occipital lobe of the brain, encroaching forward into the temporal lobe. It might incapacitate a man for transacting business; it would if it were restricted to that region entirely. Its tendency to incapacitate him would depend upon other things. If the intercranial pressure were sufficiently increased, so that there was a very enormous pressure trans-

mitted to all parts of the brain, it would interfere with his mental processes but otherwise it would not.

Dr. Singer was of the opinion that Hogg was mentally incompetent. He said a man suffering from aphasia caused by tumor in the brain becomes incompetent to transact business by reason of the fact that he is not able to understand the nature of things presented to him through his senses concerning that language. That may be either hearing or reading, or it may be a combination of the two. A man with motor aphasia becomes relatively incompetent to transact business because he is unable to express himself freely and clearly. The central features on which he said his opinion was built are the evidence of aphasia,—that there was a brain tumor and the suffering that goes with it. You could eliminate everything else but those facts and he would still have the same opinion.

Dr. Krohn, speaking with reference to the same hypothetical question which Dr. Singer answered, stated that in his opinion the man was capable of transacting ordinary business; that the hypothetical question presented the history of a great many physical troubles which do not affect the mental activity. The man had a limitation of his sense of vision,—a hemianopia,—but that had no more to do with the mental condition than if you put a card over half of the eye. It simply affects the amount of your visual field. He had a certain disturbance in the mechanics of speech,—the pure mechanical operation of speech,— aphasia. There is described a limitation of his powers to perceive words, but there is still left a mind that has enough power of sense perception to keep in contact with the outside world. There was nothing to show that his memory had been disturbed to the point that he would substitute other objects for those he attempted to recall. There was no inability to judge values. His power of reasoning or judgment was also intact. The disturbance as to the headaches has to do with the mechanics of receiving impres-

sions but does not in and of itself disturb the integrity of the thought. A tumor three inches in diameter in the left occipital lobe has nothing to do with the mentality. The tumor itself, or its size, does not make any difference. It is the manifestation you get in the man,— whether the man was able to do certain things. A man may not know the word "horses" that he sees in the newspaper, but if a horse trots in here he would know it and know the animal but not the word. He could sell a horse though he could not read the word in the newspaper, but he could trade a horse and make money by it. His inability to recognize things would be limited to the object he did not recognize. The fact that a man did not recognize a pencil would not indicate that he was unable to recognize a watch. You would have to take each object on its own basis.

The 1000 shares of Anaconda stock were evidenced by ten certificates issued in Hogg's name. Mrs. Hohmann had possession in March, 1921, of these certificates, which bore indorsements of assignments signed by Hogg which were undated and in which the name of the assignee was blank. The name of William H. Yetman was written in as the assignee and the certificates were sent to the transfer agent in New York for the issue of new certificates. They were returned because Hogg's signature was not witnessed. Signatures of witnesses were placed on them and they were again sent to the transfer agent, were canceled and new certificates were issued on March 24, 1921, in their stead to Yetman, who signed them in blank and delivered them to Mrs. Hohmann. On April 16, 1921, these certificates were surrendered by Yetman at the request of Mrs. Hohmann and new certificates were issued to Theodore P. Keller. The possession of the certificates in Hogg's lifetime, indorsed by him in blank, was *prima facie* evidence that Mrs. Hohmann was the owner of them. The burden of proving that she had not the title was upon the complain-

ants. The complainants' case in regard to this question rested upon the testimony of Yetman and his wife, Dorothy, who were at that time living at the Edgewater Beach Hotel and had there become acquainted, either in 1919 or 1920, with Mrs. Hohmann. Yetman testified that in March, 1921, Mrs. Hohmann said to him that there was Anaconda stock of the par value of $50,000 that belonged to Hogg that he would want her to get if anything happened to him, and she asked Yetman if he would have the stock transferred to his name as a convenience to her. She told him that Hogg had signed the stock, and her daughter and son-in-law assured him that Hogg's signatures on the certificates were genuine and he would want her to have the stock. Yetman said that he would transfer the stock and Mrs. Hohmann delivered it to him. He sent the certificates to the bank in New York which was the transfer agent, and they were returned to have Hogg's signature verified. Witnesses attached their signatures attesting Hogg's, and later new certificates were issued in the name of Yetman. Mrs. Yetman testified that afterward Mrs. Hohmann told her that when she was divorced from her huband, in 1918, Hogg had made the financial settlement for her with her husband, and out of that settlement had come $22,000 of the Anaconda stock, the remainder of the stock belonging to Hogg, and it was all in Hogg's vault, to which she and her daughter, Marion, had keys. She said that when Hogg recovered she would give him his stock and sell him hers. Mrs. Yetman testified that the night Hogg died Mrs. Hohmann said that she intended to keep all the stock. Mrs. Hohmann testified as to the conversations with the Yetmans that while Hogg was sick she told Yetman of the Anaconda stock; that she had had it in her box since January, 1919; that it had been assigned in blank to her, and Yetman told her to get it and have it transferred at once; that otherwise she would lose it should anything happen to Hogg, and would be written up in the papers, and Yetman persuaded

her to have it transferred to him. Mrs. Hohmann was not a competent witness to testify for herself as to any matters which occurred between her and Hogg and she did not testify to any such matters. She was cross-examined with reference to her testimony in the suit involving $5250 of government bonds, brought by her against the Yetmans in the superior court of Milwaukee county, Wisconsin, and it appeared that in that case she testified that she had received the stock in the settlement which Hogg made for her with her husband. She had had a list or statement of her settlement with her husband, but Mrs. Yetman testified that Mrs. Hohmann had purposely destroyed that list.

Mrs. Helen Galvin Delaney, whose husband died May 7, 1919, and who had known Hogg and Mrs. Hohmann many years, testified that she returned to Chicago late in May or early in June, 1919, from Detroit, where she had gone to live with her daughter following her husband's death. She called Mrs. Hohmann by telephone and made an appointment with her to come to Mrs. Delaney's room at the Sherman Hotel. While there Mrs. Hohmann called Hogg by telephone and the three had lunch together at the College Inn. Mrs. Hohmann then had the stock certificates and exhibited them to Mrs. Delaney and Hogg, saying, "Lloyd, I have brought those stocks with me to-day to ask your advice about transferring some of them; I am getting no dividends out of them, and I wonder if you would not make an exchange on some of them." Hogg answered, "Mother, hold those stocks; I consider it a good investment, and I do not think if I were you I would make any change at all; Anaconda will pay a dividend very shortly." He said to her, "Let me see them, mother." She handed them to him and he handed them to Mrs. Delaney, saying, "This is the stock which I have purchased for mother, and I think it is a very good investment; I wish you had some of that stock instead of the oil stock." He then said to Mrs. Hohmann, "Mother, will you please put those things

back into your box? I do not advise you to change them; keep your Anaconda; I am sure it will mean something to you after a while." He noted that the stock certificates were properly indorsed. Hogg left the two women together. The circumstance which appears from the evidence that the Anaconda was then paying dividends to Hogg regularly, and did so afterward, seems inconsistent with this testimony, as well as the facts that Mrs. Delaney was not registered as a guest at the hotel either in May or early June and not until June 30. Moreover, the records of the safety deposit company show that after the safety box was rented in January, 1919, when the certificates were put in it, according to Mrs. Hohmann's claim, she did not have access to her box until August 1, 1919, though Hogg had access to it June 2, June 23 and July 28, 1919.

The preponderance of the evidence indicates that Hogg's mental capacity was not affected by the tumor except so far as the intense pain may have prevented his consideration of anything else. After the two weeks of partial relief following the first operation and the return of the pain, which resulted in another visit to the hospital and the second operation, it is no doubt true that his physical condition and the intensity of his pain and suffering rendered him incompetent to transact business rationally, and this incompetency continued after the operation on the skull had relieved the pressure on the brain until he had recovered, during the month of April, from the shock of that operation. It was during this time and between the second and third operations that the 1000 shares of Anaconda stock were first found in Mrs. Hohmann's possession, disregarding for the present the testimony of Mrs. Delaney. She accounted for her possession of the stock, according to the Yetmans' testimony, not by any claim that the stock was hers or that Hogg had given it to her, but by the statement that the stock belonged to Hogg and that he would want her to have it if anything happened to him, and her daugh-

ter and son-in-law were called in to assure Yetman that the signatures on the transfers were the genuine signatures of Hogg and that he would want Mrs. Hohmann to have the stock. Why, if Hogg had given her this stock more than a year before, should she think it necessary to have it transferred to Yetman as a convenience to her? She did for some reason want to have new certificates issued in Yetman's name and assigned in blank, just as the old certificates in Hogg's name had been. If he had actually given her this stock, why was she trying to cover the transaction up? Her later statement to Mrs. Yetman, as the latter testified, that when she was divorced, in 1918, Hogg made the financial settlement with her husband for her and in that settlement she got $22,000 of the Anaconda stock and the rest of it belonged to Hogg, that it was all in Hogg's safety deposit box, to which she and Marion had keys, that when Hogg recovered she would give him his stock and sell him hers, was inconsistent with her previous statement of Hogg's ownership; and her statement, if she made it as Mrs. Yetman testified, the night Hogg died, that she intended to keep all the stock, was perhaps indicative of her attitude in the matter of the stock from the beginning. Mrs. Hohmann denied Mrs. Yetman's testimony and testified that she told Yetman that she had had the certificates in her box since January, 1919. The statement of a gift by Hogg to her in January, 1919, or of the obtaining of the stock at that time by way of settlement with her husband, is somewhat inconsistent with the receipt of dividends on the stock by Hogg for the next two years. Mrs. Delaney's testimony that the stock was in Mrs. Hohmann's possession in May or June, 1919, is also discredited to some extent by the circumstances which have already been mentioned, and it seems rather improbable that Mrs. Hohmann would have gone to the safety deposit box, taken these certificates for 1000 shares of stock, worth $40,000, from the box, carried them to the Sherman Hotel to call on her friend

and keep a luncheon engagement with her, telephoned Hogg to meet them, and there exhibited the certificates to Hogg and Mrs. Delaney for the purpose of consulting Hogg about exchanging them because she was getting no dividends on them.

It is difficult to reach any satisfactory conclusion from the evidence as to what the facts are in reference to the Anaconda stock. The evidence is contradictory and cannot be reconciled. The chancellor who heard the case heard all the witnesses testify and saw them on the witness stand. He was in a much better position than we to determine their credibility and decide whom to believe. If he refused to accept Mrs. Delaney's account of the luncheon at the College Inn and did accept the account of the Yetmans as to the conversations with Mrs. Hohmann and her statements to them in regard to the stock, he would be justified in saying that the stock was Hogg's and there had been no gift to Mrs. Hohmann, and we cannot say that such conclusion is not in accordance with the evidence.

The claim of the complainants as to the $100,000 of Liberty bonds rests upon the testimony of the Yetmans that after the transfer of the Anaconda stock Mrs. Hohmann told them that there were $100,000 of bonds belonging to Hogg in his safety box, as Yetman testified, or in the same box as the Anaconda stock, as Mrs. Yetman testified; that Mrs. Hohmann and her daughter had access to the box and that she knew Hogg would want her to have the bonds if anything should happen to him. She said that she was considering the advisability of selling the bonds and re-investing the proceeds, and Yetman at her request figured the loss on a sale, as the bonds were then selling for less than par. Mrs. Hohmann told Yetman of what issue the bonds were. Afterward Mrs. Hohmann came to Mrs. Yetman's room and said she had a package of bonds which she asked Mrs. Yetman to take care of until morning. After her husband came home Mrs. Yetman

called Mrs. Hohmann on the telephone and asked her to step to her door; that Mrs. Yetman wanted to hand her the bonds. Mrs. Yetman then gave the bonds to Yetman and he went to Mrs. Hohmann's door. Yetman testified that he handed the package, which was an envelope about twelve inches long and two inches thick, to Mrs. Hohmann. Neither Yetman nor Mrs. Yetman saw the bonds except one of the denomination of $1000, nor did they ever see any bonds in excess of the $5250 involved in the Wisconsin suit, which Mrs. Hohmann later delivered to Mrs. Yetman.

All of the evidence in regard to the bonds has no tendency to prove Mrs. Hohmann's possession of more than the $5250 which she delivered to Mrs. Yetman, except the extravagant statements of Mrs. Hohmann testified to by the Yetmans and denied by Mrs. Hohmann. While Hogg's income tax returns for 1918 and 1919 included $40,000 of government bonds, there is no evidence that he ever owned $100,000 of such bonds or that he owned any in 1921. In the absence of such proof the testimony as to Mrs. Hohmann's fantastic, improbable and contradicted statements, if she made them, are an insufficient basis for charging her with the conversion of the $100,000 of bonds. As to the $5250 which she delivered to Mrs. Yetman, her conduct in regard to them, her statements and actions in regard to her possession of them, and her method of disposal of them, tend strongly to support the chancellor's finding that they were Hogg's property.

We agree with the determination of the Appellate Court as to the facts and find no error in the record for which the judgment of the Appellate Court should be reversed. It is therefore affirmed.          *Judgment affirmed.*