(Nos. 19082, 19083.—

IDA G. HOGG, Admx., Appellee, *vs.* ROBERT ECKHARDT, Appellant.

*Opinion filed February 18, 1931.*

DUNN, C. J., and STONE and DeYOUNG, JJ., dissenting.

COOKE, SULLIVAN & RICKS, GEORGE H. MASON, R. STANLEY ANDERSON, and BEN N. BREDING, (GEORGE A. COOKE, and EDWARD H. FIEDLER, of counsel,) for appellant.

KIRKLAND, FLEMING, GREEN & MARTIN, (ALBERT FINK, FRANCIS M. LOWES, HENRY N. SHABSIN, WEYMOUTH KIRKLAND, E. BENTLEY HAMILTON, and HOWARD ELLIS, of counsel,) for appellee.

Mr. JUSTICE ORR delivered the opinion of the court:

Appellee, Ida G. Hogg, individually and as administratrix of the estate of Lloyd W. Hogg, deceased, and George W. Hogg, a minor, by appellee as his next friend, filed their verified bill of complaint in the superior court of Cook county against appellant, Robert Eckhardt, for the recovery of certain shares of stock alleged to have been owned by the deceased in his lifetime and alleged to have been transferred by him to appellant on or about April 6, 1921, without any consideration and at a time when the deceased was

mentally incompetent to manage his own estate or to make any just or proper disposition thereof and at a time when a fiduciary relation existed between the deceased and appellant. Subsequently an amended verified bill was filed, and after the conclusion of the evidence a further amendment to the bill was filed. Defendant and the corporations which had issued the stock filed their answers and the cause was referred to a master in chancery. The master filed a lengthy report, recommending that the bill be dismissed for want of equity. Exceptions to this report were sustained in part and overruled in part, and a decree was entered finding that appellant was the owner of the shares of stock of the Union Carbide and Carbon Corporation and that appellee was entitled to all the other shares of stock. Both parties perfected their appeals from this decree to the Appellate Court for the First District. The Appellate Court reversed the decree in so far as it determined that appellant was the owner of the shares of stock of the Union Carbide and Carbon Corporation and affirmed the decree with respect to the other stocks. The Appellate Court granted appellant a certificate of importance in each appeal, and his two appeals are now before this court and have been consolidated.

The original bill and the amended bill, both of which were verified by the complainants, alleged that the complainants were the widow and son, respectively, of the deceased, Hogg; that Hogg died intestate August 4, 1921, and that prior to his death he was the owner and possessed of the following shares of stock, of the value of $125,000: 1320 shares of the Union Carbide and Carbon Corporation, 2486 shares of the Sinclair Consolidated Oil Corporation, 593 shares of American Steel Foundries, 100 shares of the Stewart-Warner Speedometer Corporation, and 63 shares of the Middle West Utilities Company. The bills alleged that on April 6, 1921, and until the date of his death, Hogg was mentally incompetent to care for or manage his own

estate; that appellant was his close friend for several years prior to his death and that the deceased reposed trust and confidence in him. Both bills alleged that on or about April 6, 1921, Hogg, while mentally incompetent, assigned and transferred the stocks in question to appellant and that new certificates therefor were issued to appellant; that such transfers and assignments by Hogg to appellant were without consideration and void, and that appellant holds the stock as trustee for complainants as the heirs and next of kin of deceased.

Appellant's answer to the bill denied that Hogg ever owned the stocks, denied he assigned and transferred the stocks to appellant on April 6, 1921, or at any time when he was incompetent, but alleged that appellant was at all times the legal and beneficial owner of the stocks. It alleged that long prior to April 6, 1921, Hogg assigned all the shares of stock to appellant by endorsement in writing on the back of the certificates and also delivered them to appellant. It denied that Hogg was mentally incompetent or that a fiduciary relation existed between him and appellant but admitted that they had been very warm and close friends for many years. It denied that the assignments of the stock by Hogg to appellant were without consideration and denied that Hogg owned the stocks or that his heirs were entitled to them.

It was upon these pleadings that all the evidence was introduced before the master. The verified bills expressly asserted and relied upon an actual assignment and delivery of the stocks by Hogg to appellant but sought to set them aside on the ground of lack of consideration for the transfers and because of the alleged mental incompetency of the deceased and the existence of a fiduciary relation.

Appellee filed an amendment to her sworn bill after all the evidence had been taken and after the master's report had been filed, purporting to amend the sixth paragraph of the bill, which had alleged Hogg's assignments of the stock.

This amendment did not deny that Hogg had made the assignments but in fact alleged that such assignments were without consideration and void and that they were not a gift by Hogg to appellant. Because the amendment did not repeat the original allegations of the sixth paragraph of the amended bill with respect to Hogg's assignments, appellee contends that the original allegations were thereby stricken out of the amended bill. But no order was entered striking out those allegations from the sworn amended bill and no showing made justifying such action. It is a well established rule of equity pleading that where an amended bill or an amendment to a bill is filed, even though it omits the allegations of the original bill, those allegations remain a part of the original bill in the absence of an order of court striking them out of the bill. (*Becker* v. *Billings*, 304 Ill. 190.) In any event, portions of the amended bill which were not attempted to be amended or altered in any way necessarily recognize that Hogg assigned the stock to appellant, since they assert not only that the transfers on the record books of the corporations were invalid but also that the transfers from Hogg to appellant were without consideration and void. On the issues made by the pleadings, therefore, the sole question in this case is whether Hogg's transfers to appellant were made at a time when he was mentally incompetent or when a fiduciary relation existed, and without consideration.

Hogg was born in Chicago in 1877. He lived there all his life. He died August 4, 1921, as a result of being struck by an automobile while he was crossing the street. In 1903 he married appellee, Ida G. Hogg. They had one child, George W. Hogg, who was born in 1903. The son died in 1922 pending the suit. Hogg and his wife and son lived together until August, 1920, when they broke up housekeeping. Appellee went to the home of her relatives in Kentucky, Hogg moved to his club in Chicago, and the son was sent to a military academy in Indiana. Hogg be-

came interested in the American Spiral Pipe Works in 1901. He became vice-president, treasurer and general sales manager of the company in 1915 and continued in that capacity until shortly prior to his death. He was a large stockholder in this company and at the time of his death he owned 888 shares of its common stock. There is no evience in the record as to the value of this stock, but during several years preceding Hogg's death he had received dividends amounting to about $90,000 each year. During the two and one-half years following Hogg's death appellee received almost $75,000 in dividends on this stock. It is apparent the stock is of great value.

Appellant had been engaged in the hotel business for many years. He leased and operated the Grasmere Hotel, in Chicago, and had known Hogg intimately for twenty years. They had dinner together regularly at least twice a week at appellant's hotel or at Hogg's club, and Hogg called appellant on the telephone regularly on the remaining evenings. They were good friends.

The record shows that the stocks in question were issued from time to time during the years from 1917 to 1920, with the exception of certain stock dividends issued in 1921. The 1320 shares of Union Carbide stock were issued as follows: 250 shares in 1917, 250 shares in 1918, 600 shares in 1919 and 220 shares in 1920. The 2486 shares of the Sinclair Consolidated Oil Company were issued, 1200 shares in 1919 and 1192 shares in 1920, including stock dividends of 92 shares, and 94 shares in 1921, issued as stock dividends. The 593 shares of American Steel Foundries were issued in 1920, including 93 shares issued as stock dividends. The 100 shares of the Stewart-Warner Company stock and 63 shares of the Middle West Utilities Company stock were issued in 1920. The stocks were purchased in comparatively small lots from time to time, the transactions being more than fifty in number over the three-year period. All the shares were issued in the name of Lloyd W. Hogg, and they

are all endorsed by him on the form of assignment on the back of the certificates.

The record in this case is very voluminous and no good purpose would be subserved by setting out the evidence in detail in this opinion. For an epitome of Hogg's life, business connections and experiences, domestic and social relations with the parties to this suit, his physical and mental condition during 1920 and 1921 and up to the time of his death, the nature of his disabilities and the treatment therefor, reference is made to pages 547 to 554 of the opinion in *Hogg* v. *Hohmann,* 323 Ill. 545. While the parties in this suit and that are not the same, the evidence there set forth on the subjects above enumerated is fairly representative of the evidence in this case. Many witnesses, both lay and medical, testified as to Hogg's mental and physical condition. After a careful consideration of this evidence we are of the opinion that there were only four occasions between February 1, 1921, and the date of Hogg's death when he was incompetent to understand and transact ordinary business, namely, a day or so after February 4, when the first sinus operation was performed; a day or so after March 15, when the second sinus operation was performed; a period of a week to ten days after the decompression operation of March 31 was performed, and at other times between March 11 and April 7, 1921, when he had been given morphine and codein.

It is stipulated by the parties that Hogg signed his name on the back of each certificate of stock here in question at about the date of its issuance, and that by the date of issuance is meant the date which the certificates of stock, respectively, bear upon their face. These certificates of stock were all issued at times when it was shown by the evidence that Hogg was not incompetent to understand and transact ordinary business. The law has been generally established that as between the parties the transfer of stock by delivery of the certificate, with power of attorney or en-

dorsed in blank, passes title without the transfer on the books of the company. (*Otis* v. *Gardner,* 105 Ill. 436; *Rice* v. *Gilbert,* 173 id. 348.) Such blank transfer on the back of the certificate to which the holder has affixed his name is a good assignment and the party to whom it is delivered is authorized to fill it up. It may be filled up with the name of a remote transferee, and the name to be inserted concerns only the purchaser. With the transfer of the stock on the books of the corporations Hogg had nothing to do. It did not concern him. Its object was the protection and convenience of the assignee. (*McCarthy* v. *Crawford,* 238 Ill. 38.) Although these transfers on the books of the corporations occurred in April, 1921, the record shows that the certificates had been assigned and delivered to appellant long prior thereto and at a time when Hogg was mentally competent. Hogg's incompetency at the time of the transfers on the corporation books was entirely immaterial, as it is the settled rule that the fact a former owner is insane, or even dead, at the time of such transfers has no effect on the validity of the transfers. (*Coffey* v. *Coffey,* 179 Ill. 283; 2 Cook on Corporations,—8th ed.—p. 1360; 14 Corpus Juris, 676; *Citizens Bank* v. *Mutual Trust and Deposit Co.* 206 Ky. 86, 266 S. W. 875.) This disposes of the question of Hogg's incompetency.

Possession of stock certificates endorsed in blank is *prima facie* evidence of ownership in the possessor, and the burden of producing evidence on the question of ownership rests upon the person disputing such ownership. (*Hogg* v. *Hohmann,* and *Coffey* v. *Coffey, supra.*) This burden may, however, be shifted to the possessor by proof that he obtained such possession from the prior owner at a time when a fiduciary relation existed between him and the prior owner. We need not review the evidence and the conflicting contentions of the parties with respect to whether a fiduciary relation existed between Hogg and appellant. The decree finds that a fiduciary relation existed between them

from September 23, 1920, until Hogg's death, on August 4, 1921. From the evidence in this record the chancellor properly limited the commencement and duration of the alleged fiduciary relation to that period, as there is no evidence which would justify a finding that any such relation existed prior to September 23, 1920. The effect of the existence of such a relation is to raise a presumption that transactions between the parties during its existence are fraudulent and void and to cast upon the one benefiting from such transactions the burden of proving they were entirely fair and not the result of fraud or undue influence. But, obviously, the existence of such a relation at a given time has no effect upon transactions between the parties which occurred prior to the commencement of the relation. In *Allen* v. *McGill*, 311 Ill. 170, this court said: "Where a fiduciary relation exists, the burden of proof is on the beneficiary of the instrument executed during the existence of such relationship to show the fairness of the transaction and that it did not proceed from undue influence." And in *Chaney* v. *Baker*, 304 Ill. 362, the rule was explained as follows: "It is not the confidential relation which creates such a presumption, but it is the fact that the confidential relation is used for the purpose of procuring the making of the will."

Where a complainant alleges that a transaction is invalid by reason of a fiduciary relation and on that basis seeks to recover property in the possession of the defendant, relief is predicated upon the doctrine of constructive trusts, and when awarded it is on the theory that the defendant holds title as trustee for the grantor, (*Housewright* v. *Steinke*, 326 Ill. 398; *Kern* v. *Beatty*, 267 id. 127; *Roche* v. *Roche*, 286 id. 336;) and in such cases it is incumbent upon the complainant to establish the claim of fiduciary relation and constructive trust by proof which is "clear and convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion." (*Rubin* v. *Midlinsky*,

321 Ill. 436; *Streeter* v. *Gamble,* 298 id. 332; *Niland* v. *Kennedy,* 316 id. 253; *Fish* v. *Teninga,* 330 id. 160.) It was therefore incumbent upon appellee to establish by clear proof not only the existence and period of the fiduciary relation but also that the assignments of the stocks by Hogg to appellant occurred at a time when the relation existed. A careful study of the record on this subject convinces us that the evidence shows beyond doubt that except for a few shares of stock which were issued as stock dividends or pursuant to "rights" on stocks previously issued, all the stocks in question were assigned and delivered by Hogg to appellant prior to September 23, 1920, except the Stewart-Warner stock. For this reason there can be no presumption that the transactions prior to September 23, 1920, were invalid, and the burden of proof was not upon appellant to show that the assignments prior to that date were fair and not the result of undue influence. It is necessary only to consider the evidence on the question as to what portion, if any, of the transactions occurred between September 23, 1920, and the date of Hogg's death, and what portion occurred prior to September 23, 1920, the burden being upon appellee to show that the transactions occurred between September 23, 1920, and August 4, 1921.

Herbert D. Draper, an official of an investment securities company who had known both Hogg and appellant for several years, testified that in February, 1920, in his presence, Hogg endorsed a number of certificates of stock of the Union Carbide Company and the Sinclair Oil Company and then handed them to appellant. He testified that on that occasion he asked Hogg if he was buying stocks, and Hogg told him he had been buying some for appellant and that he thought these stocks were good "buys" at the time. J. Hall Taylor, who was president of Hogg's company and a warm friend, testified that in November, 1920, he had received certain "rights" to purchase shares of stock of the Union Carbide Company at $40 a share. At that time, in

discussing the matter with Hogg, Taylor told him that he was not going any deeper in this stock and asked Hogg if he was. Hogg's reply was that he had bought some Union Carbide Company stock "for a friend of his." Taylor testified that this was all that Hogg said and that Hogg did not state who his "friend" was. In addition to this testimony there is evidence indicating that Hogg delivered the bulk of the stock to appellant some time prior to July, 1920. Draper testified that in July, 1920, he had a transaction with appellant concerning some other stocks and at appellant's request went with him to the latter's safety deposit box on the north side of Chicago. After their other transaction had been completed appellant took a large number of stock certificates from his box, showed them to the witness and asked him what it would cost to have the stocks transferred on the books of the companies. Draper testified that among the certificates which he examined were twenty or twenty-five certificates of the Sinclair Oil Company for about 2000 or 2500 shares, about twelve certificates of the Union Carbide Company for 1000 or 1200 shares, five or six certificates of American Steel Foundries, and one certificate each of the Stewart-Warner Company and the Middle West Utilities Company. He also testified that he examined the certificates and found that they were all made out in Hogg's name and endorsed in blank on the back and that the endorsements were properly witnessed. Draper told appellant the transfer costs would be from $125 to $165 and that he would be glad to take care of the transfers for him at any time. On cross-examination the witness admitted that he could not identify all of the certificates as those he saw in appellant's box in July, 1920, and that he was able to testify only generally as to the number of certificates of the stock he examined at that time. This witness testified further that he next saw the certificates in question in April, 1921, at which time appellant took them to the office of the witness for transfer, and they were

transferred within a few days and new certificates issued and delivered to appellant. The testimony of this witness has been subjected to a severe attack by counsel for appellee. The master heard the witness and had an opportunity to study him while he was on the witness stand. The master, after stating the substance of that testimony and relying upon it in support of his conclusions, found as follows: "While upon cross-examination this witness was unable to identify any particular certificate as the certificate seen by him upon his visit to the vault with said Eckhardt in July, 1920, his testimony that Eckhardt had similar certificates of stock in his possession at that time has not been discredited in any way."

Avery G. Warren, another witness for appellant, testified that he had borrowed money from appellant and on November 6, 1920, re-paid him $650 by check, which was produced on the trial. At that time Warren asked appellant for the note evidencing the loan and went with him to the latter's safety deposit box at the Sheridan Trust and Savings Bank, in Chicago. In taking the note from the box appellant also took out two packages containing stock certificates of the Union Carbide Company and the Sinclair Oil Company and showed them to Warren. Warren testified that he looked at the certificates, that they were made out in Hogg's name and endorsed on the back, and that there were about ten or twelve of the Union Carbide Company and about twice as many of the Sinclair Oil Company. Appellee, although conceding that this witness might have seen the certificates in appellant's box in November, 1920, seeks to discredit his testimony. After referring to Warren's testimony the master found that while the witness was unable to positively identify the stock certificates in issue, his testimony showed "beyond dispute that the defendant, Eckhardt, had in his safety deposit box at the Sheridan Trust and Savings Bank in the month of Novem-

ber, 1920, certificates of stock similar to those offered in evidence."

There is no evidence in this record establishing that Hogg's funds were used to purchase the stocks. Although his income during the years in question was very large, amounting to several hundred thousand dollars, the record shows that he disposed of the great bulk of it in other directions. The fact that the stocks were in each instance issued in Hogg's name would raise a presumption that they were his since legal title was vested in him, but such a presumption is overcome by the undisputed and agreed fact that he assigned each certificate immediately upon its issuance in his name and that appellant was in possession of the certificates while they were in that condition.

There is no evidence as to the cost of the stocks, and it is impossible to determine from the record the purchase price paid for the stocks over the four-year period from 1917 to 1921. Appellant introduced in evidence approximately fifty checks, totaling $56,905.51. They range in date from 1917 to 1920, the latest being dated December 20, 1920. These checks were drawn on two Chicago banks—Sheridan Trust and Savings Bank and Union Trust Company. They were all made payable to the order of appellant and were signed, "Hotel Grasmere, by Robert Eckhardt." Appellant was the owner of this hotel. Each check bore the endorsement of appellant and of the bank which cashed it. The checks were issued for varying amounts at different dates—in most cases one a month but sometimes two. The paying tellers of the Union Trust Company and the Corn Exchange National Bank, who had cashed all these checks, were called as witnesses. Hogg had an account in both banks and the paying tellers were well acquainted with him. They identified each check by the paying teller's stamp which he had placed upon it, and testified that they had cashed all the checks for Hogg without requiring him to endorse them. In explanation of this some-

what unusual procedure they testified that when Hogg presented checks of other persons to be cashed or deposited to his account and the checks and endorsements were complete in themselves so as to be payable to the bearer, Hogg uniformly refused to endorse the checks and by reason of his insistence succeeded in inducing both banks to dispense with their customary requirement. One of the tellers testified that Hogg seemed to think that requiring him to endorse such checks was questioning his word or his own financial responsibility. The testimony of these bankers is convincing. It shows that without doubt Hogg received the proceeds of these checks, totaling about $57,000, during the period when the stocks in question were purchased. In several instances the record shows that on the same days Hogg cashed these checks he deposited approximately the same or a greater amount in his checking account in one or the other of these banks. Hogg's bank account on the books of one of these banks has disappeared, and there is therefore no showing that the proceeds of all these checks were so deposited. The master found that Hogg cashed all the checks and "received the proceeds thereof."

Another circumstance relied upon by appellant to establish that he was the owner of the stocks relates to the dividends issued on them. About twenty dividend checks were issued to Hogg while the stocks stood in his name. All these checks were endorsed by Hogg and all but three or four of them were cashed and not deposited by him. In this connection appellant was permitted to testify, without objection, that whenever Hogg received these dividend checks he paid the proceeds to appellant. A portion of this testimony was brought out by appellee and the remainder was given without objection. Under these circumstances the incompetency of the witness was waived and his testimony in this respect is competent and must be considered. (*Millard* v. *Millard*, 221 Ill. 86.) Appellant's testimony that Hogg re-paid him the amount of the cash divi-

dends received on the stocks is supported by the fact that whenever stock dividends were issued in Hogg's name, as the owner of record, Hogg endorsed each stock dividend certificate in blank at the time of issuance and the fact that the certificates themselves show that each such endorsement was made in appellant's presence. These stock dividend certificates were about ten in number and total about 300 shares.

The stock certificates were transferred of record on the books of the various companies to appellant's name April 6, 1921. The record shows that on April 5, 1921, appellant delivered the certificates to the Federal Securities Company for transfer. This was the company with which Draper was connected and it was accustomed to taking care of such matters. At that time the certificates of stock were still endorsed in blank and appellant's name had not been written into the assignment form as transferee. The Federal Securities Company inserted appellant's name in the forms, dated them April 5 or April 6, 1921, affixed the necessary Federal revenue stamps and attached its guaranty of the genuineness of Hogg's signature. The certificates were delivered to the companies and shortly afterwards the new certificates were issued in appellant's name and delivered to him. After these transfers a dividend check which had been issued, prior to the transfers, on the Union Carbide Company stock was received by Hogg, who endorsed it and evidently delivered it to appellant, as he likewise endorsed and cashed it. In like manner some stock dividend certificates on the Sinclair Oil Company stock issued April 15, 1921, in Hogg's name were immediately endorsed by Hogg and apparently delivered to appellant, as they were transferred to appellant on the company's books a short time later. After all the stocks had been so transferred on the books to appellant all the dividends were paid directly to appellant by checks of the companies, amounting to several thousand dollars, prior to Hogg's death in August, 1921.

We have thus far, for the most part, considered the evidence with respect to the circumstances up to the time of Hogg's illness. As previously stated, Hogg's mental condition is immaterial in the absence of proof that he transferred the stocks to appellant at a time when he was mentally incompetent. There is no evidence that Hogg's assignments occurred at such a time, and the uncontradicted evidence shows that practically all the assignments occurred prior to July, 1920, and therefore long prior to the inception of Hogg's illness. The burden of establishing that the transactions between these men occurred during the few days of Hogg's mental incompetency was upon the appellee and has not been sustained by proof.

We shall now consider the evidence concerning each of the stock issues in question. As previously stated, the record shows that Hogg endorsed in blank all the certificates of stock at the dates of their issuance from 1917 to 1921. With respect to the 1320 shares of Union Carbide stock the evidence is that the certificates of 1200 shares were issued prior to July, 1920, and were therefore endorsed by him prior to that time. The evidence shows that appellant had these 1200 shares in his possession in July, 1920. It therefore appears that these shares were assigned to appellant prior to the alleged fiduciary relation and he is entitled to them. The remaining 120 shares were issued in. November, 1920, pursuant to "rights" given the stockholders to subscribe for additional shares equivalent to ten per cent of their holdings, at $40 per share. These shares were assigned by Hogg after September 23, 1920, but since the original 1200 shares, on the basis of which these 120 shares were subscribed for, were the property of appellant, and he, alone, as such owner, was entitled to exercise the "rights," he, and not Hogg, was entitled to them. This conclusion is confirmed by the evidence of the witness Taylor, who testified that at about the time the 120 shares were issued Hogg told him he had bought Union Carbide stock "for a

friend of his." Moreover, after the entire 1320 shares had been transferred to appellant on the company's books, Hogg in the latter part of April, 1921, endorsed and delivered to appellant the dividend check for $1980 on the 1320 shares. The chancellor found that appellant had fully shown the fairness of the transactions with respect to the Union Carbide stock and that all these shares were the property of appellant. We agree with this conclusion.

Of the 2486 shares of the Sinclair Oil Company stock, the record shows that 2300 were issued and endorsed in blank by Hogg prior to April, 1920. As previously stated, these were in appellant's possession in July, 1920, prior to the commencement of the alleged fiduciary relation, and he is therefore entitled to them. The remaining 186 shares were represented by certificates issued from July 15, 1920, to April 15, 1921. These were all issued, however, as stock dividends, and for this reason appellant, who owned all the shares on the basis of which these dividends were issued, is entitled to the stock dividends notwithstanding the fact that most of them were issued to and endorsed by Hogg after September 23, 1920, and notwithstanding the fact that there is no evidence as to the time when appellant obtained possession of them.

Of the 593 shares of American Steel Foundries stock, 530 shares were issued up to June 1, 1920, and endorsed in blank by Hogg from time to time prior thereto. The evidence shows that they were in appellant's possession in July, 1920, prior to the commencement of the fiduciary relation, and he is therefore entitled to them. The remaining 63 shares were issued as a stock dividend in December, 1920. Since these were stock dividends their ownership followed the ownership of the shares on the basis of which they were issued, for reasons previously stated.

The 63 shares of the Middle West Utilities Company stock were represented by a single certificate issued in June,

1920, and endorsed in blank by Hogg at that time. The evidence shows that this certificate was in appellant's possession shortly afterwards, in July, 1920, and he is therefore entitled to it.

The certificate of the Stewart-Warner stock representing 100 shares was issued September 23, 1920, and was endorsed by Hogg on April 6, 1921. The fiduciary relation then existed, and we are of the opinion that this stock should be held the property of appellee for the reason that the burden of producing evidence of circumstances under which possession of the same was obtained was upon appellant and he failed to produce such evidence.

There were twenty-seven occasions when Hogg endorsed the stock certificates over a period of three years. The stock certificates themselves show that the endorsements occurred in appellant's presence on each of these numerous occasions. As to some of the certificates the evidence is that they were delivered by Hogg to appellant at the time when they were endorsed. As to the others, with the exception of the Stewart-Warner stock and some of the stock which was issued as dividends, while the record does not expressly show the dates of delivery it does show that they must have been delivered to appellant prior to July, 1920, for they were in his possession as early as that date. Appellee thus in the main failed to prove that the transactions occurred during the period of alleged fiduciary relation. On the contrary, the proof shows the transactions occurred at a time when clearly no such relation existed. We are of the opinion that the facts and circumstances established by this record show that appellant was the owner of all the stocks in controversy except the Stewart-Warner stock. The fact that Hogg assigned all these stock certificates at the times they were issued, or soon thereafter, is in itself a strong circumstance indicating that he was not the owner, when the evidence shows that he did not follow this practice as to any stocks which were admittedly his own prop-

erty. The evidence as to Hogg's disposition of the dividends and stock dividend certificates also tends to show that appellant was at all times the owner of the stocks. Hogg made a practice of cashing the dividend checks rather than depositing the checks to his account. These checks totaled a large amount, and the evidence shows that Hogg paid to appellant from time to time the amount of these dividends. He did the same with the stock dividends, for he endorsed each such certificate in appellant's presence soon after it was issued, and a number were in appellant's possession in July, 1920. After all the stocks had been transferred to appellant on the books of the companies Hogg endorsed and delivered to him a dividend check for $1980 on the Union Carbide stock in payment of a dividend on 1320 shares which had accrued prior to the record transfers. Likewise, after the stocks had been transferred to appellant on the company's books Hogg assigned and delivered to him further stock dividend shares of the Sinclair Oil Company, being a stock dividend which had accrued prior to the record transfers. After the record transfers of all the stocks to appellant's name the dividend checks were issued direct to appellant instead of Hogg, and although these amounted to a considerable sum prior to Hogg's death, there is nothing in the record to indicate that Hogg did not fully acquiesce in both the record transfers and the receipt of the dividends by appellant. Appellant made payments to Hogg by checks totaling about $57,000, and although there was no evidence directly establishing that these payments were made for the purpose of having Hogg purchase the stock for appellant, the only reasonable conclusion is that they were for that purpose. The master expressly found that "the receipt by Hogg of these large amounts has not been explained or accounted for in any way," and that appellant's testimony was "not admissible to explain them or to show other payments, if any, which may have been made

by him." Many other circumstances disclosed by the record also tend to show that appellant was the owner of the stock, but it is unnecessary to consider them.

One of the circumstances relied upon by appellee as indicating that Hogg transferred the stocks to appellant at a time when he was incompetent or during the period of the fiduciary relation is that Hogg and appellant had two joint safety deposit boxes to which both had access. It is argued that perhaps appellant took the stock certificates from one of these boxes during Hogg's illness and without his knowledge. The first of these boxes was rented September 22, 1920, and this was evidently the basis of the finding of the chancellor that the fiduciary relation began on September 23, 1920. There is no evidence that any of the certificates were ever in this box. On the contrary, the uncontroverted evidence is that the certificates were in appellant's exclusive possession in his individual box in July and also in November, 1920, and so they could not have been in the joint box during that period. The records of the safety deposit company show that Hogg visited this box repeatedly. He opened the box on January 6 and 17, 1921, before the record transfers. He also opened the box on May 4, 1921, after the transfers and when he was admittedly competent, and if the certificates had been in the box and had been removed he would probably have noticed it at these different times. The last entry into this box was made July 5, 1921. It is impossible to determine from this record whether appellant went to the box alone on that date or whether Hogg was also present. The attendants of the safety deposit company testified that Hogg and appellant usually went to the box together but that in such cases the name of only one was placed on the records. They were unable to say whether only one or both of the parties were present on that occasion. In any event, this was several months after the stocks had been transferred of record to appellant, and it is clear from this record that none of

the stocks could have been in the box at that time. The second joint box was rented April 19, 1921. Since this was after the stocks had been transferred of record to appellant, it is apparent it has no bearing upon the question whether he obtained the stocks from Hogg during his incompetency. There is nothing which could in any way connect this box with the stocks in question, for prior to the renting of this box all the stocks had been transferred to appellant and new certificates issued in his name.

Much stress is laid in appellee's argument on the fact that appellant visited this jointly-owned box on the day of Hogg's death. What, if anything, he took therefrom is not shown by the evidence. Since no charge is made in the bill of complaint that appellant had possession of any of Hogg's property except the stocks in question, what took place at that time is not material to any of the issues in this case.

Another circumstance relied upon by appellee relates to Hogg's income tax return for the year 1920. This return was prepared for Hogg by appellant April 14, 1921, after Hogg had left the hospital. Included in the return were dividends received by Hogg during 1920 on the stocks in question, and it is argued that this establishes that Hogg owned the stocks in his own right. There would be force in this contention in the absence of the other evidence we have alluded to, but in view of the uncontradicted evidence as to Hogg's practice in cashing the dividend checks rather than depositing them, and the uncontradicted evidence that he paid the amount of dividends to appellant as they came in, the inclusion of these dividends in Hogg's return does not prove that he owned the stocks. Upon being interrogated with reference thereto by appellee's attorney, Eckhardt testified that Hogg told him he had received $88,000 dividends from the American Spiral Pipe Works; that all in the return in dividends above the dividends from that company were "dividends on stocks that were in Mr. Hogg's

name that I received but were on his income tax for the reason that the stock was in his name. Aside from that I know of no other dividends. Those dividends were Carbide, American Steel Foundries, Stewart-Warner. I think that is all." This statement having been brought out by appellee's attorney and not being contradicted by any other evidence cannot be disregarded. All the other facts and circumstances above mentioned with respect to Hogg's immediate endorsements of the stock certificates, his payment of these dividends to appellant and appellant's checks to Hogg, in our opinion preclude the claim that Hogg owned any of the stocks or that the income tax return established such ownership.

Another circumstance relied upon by appellee relates to a financial statement given by appellant to R. G. Dun & Co. dated July 8, 1920. It is contended that since appellant did not list as owned by him the stocks in question this statement shows he did not own them at that time. This statement was made on a printed form furnished by the mercantile agency. Appellant was the sole owner of the hotel and in filling out the statement he added his name to that of the hotel, and it is urged that this shows the statement purported to be a complete one, including not only the assets of the hotel but also appellant's other assets not included in the business. We cannot agree with this contention. This statement obviously related only to the hotel and its assets and business. The blanks filled in and those not filled in demonstrate this was its sole purpose. After items relating to real estate and equities therein which were not filled in, appears an item, "Total worth in and out of business," which was likewise not filled in. At no place in the statement was there any item or space for listing stocks of corporations or other similar investments, and the failure to list any of these cannot be taken as indicating that appellant did not own the stocks in question at the date of the statement, July 8, 1920. The fact that he was

the sole owner of the hotel, and therefore its assets belonged to him, did not make his individual assets those of the hotel or assets devoted to the hotel business.

A circumstance relied upon by appellee as indicating that appellant might have taken advantage of Hogg is that appellant was with him almost constantly during his illness and afterwards, and that appellee saw Hogg only twice during that period. We have carefully reviewed the evidence on this subject, and while there is a conflict, in our opinion it fails to show that appellee was prevented from seeing Hogg at any time. The master's report shows that he carefully considered this contention. After reciting the fact that appellee and her sister visited Hogg only twice after their return to Chicago, the master found that "these calls were short, and while they both testified that he [Hogg] seemed pleased to see them, it does not appear that either of them attempted to see him there again during the months of May, June and July." He also found that "during the same period he [Hogg] received visits from friends and acquaintances at the Grasmere Hotel, and there seems to be no apparent reason why the complainant or her sister, Emma Gunther, should not have called upon said Hogg at the Grasmere Hotel had they seen fit to do so." During the period in question Hogg's son lived with him at the hotel and was with him much of the time for several weeks until he went away, with other boys, on a vacation. Appellee knew that her son was living with Hogg and yet did not visit him except on the two occasions referred to. Moreover, she admitted on the witness stand that after those visits she did not see or attempt to again see Hogg until after his death. This record shows that Hogg and appellee had been estranged for some time, and this, no doubt, was the reason she failed to visit Hogg more frequently.

The judgment of the Appellate Court is reversed and the decree of the superior court of Cook county is affirmed in part and reversed in part and the cause is remanded to

the superior court, with directions to enter a decree award-ing all the stock in controversy to appellant except the 100 shares of Stewart-Warner stock, which will be awarded to appellee. *Reversed and remanded, with directions.*

Dunn, C. J., and Stone and DeYoung, JJ., dissenting.